**AMERICAN FOREST RESOURCE COUNCIL fka Northwest Forestry Association fka Northwest Forest Resource Council, et al., Plaintiffs,**

v.

**Patrick SHEA, Director, Bureau of Land Management, et al., Defendants.**

No. 94–1031 (TPJ).

United States District Court, District of Columbia.

Sept. 19, 2001.

See also 80 F.3d 1401.

Michael Flynn McBride, Leboeuf, Lamb, Greene & Macrae, L.L.P., Washington, DC, for Northwest Forest Resource Council, South Umpqua School District, Western Council of Industrial Workers, Deborah Ladd–Howell, Seneca Jones Timber Co., Nathan Smith, J.M. Schmidt, William Wynkoop, Daniel Newton, C & D Lumber Co., Swanson Brothers Lumber Co., Myron Mead, Alden Lish, Michael Roy McMurray, Galliher & Huguely Associates, Inc.

Wells Daniels Burgess, U.S. Department of Justice, Environment & Natural Resources Division, Andrea Gacki, U.S. Department of Justice, Andrea L. Berlowe, John P. Almeida, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Bruce Babbitt, Secretary of Interior, Patrick Shea, Director, Bureau of Land Management.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

The American Forest Resource Council ("AFRC"), a forest products trade association, and 13 co-plaintiffs have revived this long-delayed action against the Director of the Bureau of Land Management ("BLM") and the Secretary of Interior to vitiate the

Northwest Forest Plan, a forest management regime enforced by the Department of Interior since April of 1994. The effect of the Plan at issue here is to restrict private timber harvesting and road construction activities on BLM forest lands in the Pacific Northwest to levels vastly below those permitted until approximately 1992.

The case is currently before the Court on the government's motion for summary judgment: the plaintiffs' claims are barred, the government contends, by the doctrine of *res judicata,* because the issues raised were litigated—or could have been litigated—in related cases decided by District Judge William L. Dwyer in the Western District of Washington, later affirmed by the U.S. Court of Appeals for the Ninth Circuit. For the reasons to follow, this Court concludes that the lead plaintiff, AFRC, is clearly barred by *res judicata* in this action, being a direct successor-in-interest to an actual participant in the Western District of Washington litigation, and that AFRC's co-plaintiffs are barred under a corollary known as the "doctrine of virtual representation" because their interests were adequately represented by the AFRC's predecessor in the previous litigation.

## I.

The origins of this controversy stretch back over a decade and several presidential administrations. As described by Judge Dwyer in detail in *Seattle Audubon Society v. Lyons,* 871 F.Supp. 1291 (W.D.Wash.1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401 (9th Cir.1996) (hereinafter the "Seattle litigation"), it commenced with actions by allied environmental organizations against the federal government, in a series of cases that have come to be known by the sobriquet "the owls cases," seeking to protect the habitat of the northern spotted owl in the Pacific Northwest from indiscriminate timber-cutting. The lead environmental litigant was the Seattle Audubon Society, and the cases were consolidated under Judge Dwyer as the nucleus of the Seattle litigation.

At the outset of the legal imbroglio, the Seattle Audubon Society and its confederates charged the government with a failure to comply with national environmental laws in managing federal forest lands. Judge Dwyer basically agreed with the environmental plaintiffs and enjoined further logging on the lands until the government brought its land management practices into compliance with applicable environmental statutes, whereupon AFRC's predecessor, Northwest Forest Resource Council ("NFRC"), a not-for-profit trade association (representing, however, the for-profit interests of the timber and forest products industries in the Pacific Northwest) entered the Seattle litigation as an intervenor-defendant in defense of the *status quo.*

While the government strove to develop a management plan acceptable to Judge Dwyer, the change in administrations altered the direction of its efforts. An interagency task force known as the Forest Ecosystem Management Assessment Team ("FEMAT") was convened to, *inter alia,* address the problems Judge Dwyer had identified with the old forest management plan. FEMAT held lengthy hearings to consider various alternatives, the process culminating in a new forest management plan ("Northwest Forest Plan" or "Plan") jointly adopted by the Forest Service ("USFS") and the Bureau of Land Management ("BLM") on April 13, 1994.[1]

---

1. While the Northwest Forest Plan was being    formulated, NFRC filed *Northwest Forest Re-*

The Northwest Forest Plan substantially curtailed logging on public lands by private concerns.

After the Northwest Forest Plan had been adopted, NFRC and other pro-industry co-parties promptly challenged it by filing the instant case and a related case, *Northwest Forest Council v. Thomas,* Civil Action No. 94–1032 (D.D.C. filed May 11, 1994), in the U.S. District Court for the District of Columbia. A confederacy of Oregon counties simultaneously filed *Association of O & C Counties v. Babbitt,* Civil Action No. 94–1044 (D.D.C. filed May 12, 1994), which also challenged the Plan on various theories of arbitrary and capricious agency action.

This Court acted on these cases in a series of rulings. To conserve judicial resources and forestall the prospect of potentially inconsistent judgments, on June 30, 1994, the Court transferred the *Thomas* case to the Western District of Washington, but stayed this case and the *O & C Counties* case—neither of which was eligible for transfer—to await the outcome of the earlier-filed consolidated Seattle litigation.

The combination of the *Thomas* transfer and the two stays caused a complex chain-reaction amongst the several cases. NFRC voluntarily dismissed the *Thomas* case rather than have it heard in the Western District of Washington. The government then filed a cross-claim against NFRC (a co-defendant in the Seattle litigation) for a declaratory judgment to the effect that neither this case nor the claims made in the now-defunct *Thomas* case had merit. NFRC responded with a petition

to this Court for an injunction prohibiting the government from prosecuting its cross-claim in the Seattle litigation. The Court declined to rule on the petition, allowing the matter to become moot on December 21, 1994, when Judge Dwyer issued an order awarding the government summary judgment, and disposing of the cross-claim in the process, by declaring that the Northwest Forest Plan met the standards established by applicable environmental laws in all respects. *See Lyons,* 871 F.Supp. at 1325. On February 15, 1995, Judge Dwyer concluded the Seattle litigation with an entry of judgment upholding the Northwest Forest Plan.

On February 28, 1995, NFRC moved to lift the stay in this case, but this Court extended the stay until the Ninth Circuit had affirmed Judge Dwyer's decision in the Seattle litigation on April 10, 1996. After the Ninth Circuit issued its opinion, the Court dismissed this case on *stare decisis* grounds on May 22, 1996. Plaintiffs appealed, and on March 7, 1997, the D.C. Circuit rejected *stare decisis* as a ground of decision, reversed the dismissal, and remanded the case with instructions to the Court to determine whether plaintiffs' claims in the case are barred by principles of issue or claim preclusion. *See Northwest Forest Resource Council v. Dombeck,* 107 F.3d 897, 901 (D.C.Cir.1997).

## II.

The government's motion for summary judgment makes two basic arguments. First, because AFRC (in its prior incarnation as NFRC) was a party in the Seattle

---

source *Council v. Espy,* Civil Action No. 93–1621, in this Court to challenge the procedures used by FEMAT. NFRC sought declaratory relief to the effect that FEMAT violated the Federal Advisory Committee Act ("FACA"), and an injunction prohibiting further meetings of FEMAT and prohibiting gov-

ernmental use of any work done by FEMAT while in violation of FACA. On March 21, 1994, this Court granted declaratory relief, but declined to enjoin the Plan or use of the data acquired by FEMAT. *See Northwest Forest Resource Council v. Espy,* 846 F.Supp. 1009 (D.D.C.1994).

litigation, the doctrine of *res judicata* bars AFRC from litigating its claims here. Second, the doctrine of virtual representation precludes AFRC's 13 co-plaintiffs as well from re-litigating the issues that were raised—or should have been raised—in the Seattle litigation, even though they were not formally parties thereto.

■■■■ The doctrine of *res judicata* bars a party from re-litigating claims that were, or could have been, asserted in the initial action. *See Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). "The doctrine of *res judicata* serves vital interests in the administration of justice" by "prevent[ing] repetitious litigation involving the same causes of action or the same issues." *I.A.M. Nat'l Pension Fund, Benefit Plan A v. Indus. Gear Mfg. Co.,* 723 F.2d 944, 946, 950 (D.C.Cir.1983). For *res judicata* to apply, the following elements must be satisfied: "(1) an identity of parties in both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and (4) an identity of the cause of action in both suits." *Paley v. Estate of Ogus,* 20 F.Supp.2d 83, 87 (D.D.C.1998).

The government currently observes that all four requirements are satisfied to bar AFRC from re-litigating its own claims. First, AFRC is the successor-in-interest to the Northwest Forest Resource Council ("NFRC"), which was a party to the Seattle litigation and merged into AFRC on January 1, 1999. Second, the Western District of Washington, which rendered the judgment in the Seattle litigation, is a court of competent jurisdiction. Third, the judgment, entered February 15, 1995, and

affirmed by the Ninth Circuit on April 10, 1996, was final and on the merits. Fourth, the cause of action in the instant case and in the Seattle litigation is identical.[2]

■■■■ AFRC does not dispute the government's claim that all four elements of *res judicata* are satisfied, but instead argues that *res judicata* should not apply in the circumstances, because the government sought only declaratory relief against NFRC in the Seattle litigation. Under the so-called declaratory judgment exception to the doctrine of *res judicata:*

> Where a party asks only for declaratory relief, courts have limited the preclusive effect to the matters declared, hence permitting a later action seeking coercive relief based on the same cause of action. Indeed, the very language of § 2202 [of the Declaratory Judgment Act] indicates that the prevailing party in a declaratory judgment may seek further relief in the form of damages or an injunction.

*Horn & Hardart Co. v. National Rail Passenger Corp.,* 843 F.2d 546, 549 (D.C.Cir.1988).

As the government counters, however, the declaratory judgment exception does not apply in this case: the government sought both declaratory *and* injunctive relief in its cross-claim against NFRC in the Western District of Washington. Moreover, the declaratory judgment exception allows only the *"prevailing party* in a declaratory judgment" to seek "further relief in the form of damages or an injunction." *Horn & Hardart Co.,* 843 F.2d at 549

---

**2.** The government explains that both suits challenge the forest management plan adopted by the Secretary of the Interior on April 13, 1994, governing approximately 2,700,000 acres of BLM forest lands. The government notes that the first seven claims raised in the Second Amended Complaint were resolved in the Seattle litigation. Furthermore, the government claims that the remaining eight claims arose out of the same nucleus of operative facts that gave rise to the Seattle litigation and therefore could have been resolved in the Seattle litigation had NFRC chosen to assert them there.

(emphasis added). NFRC did not prevail in the Seattle litigation.

■ AFRC also argues that, because the government sought summary judgment on only nine of the eleven claims in the Seattle litigation and withdrew its motion as to the remaining two claims, these claims at least remain undecided, and AFRC should not be barred from pursuing them here. The government responds that it did not seek summary judgment on the two remaining claims because there were material facts in dispute on the claims, and again correctly points out that the doctrine of *res judicata* bars a party from re-litigating all claims that were, or could have been, resolved in the prior action. *See Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Although the two claims may thus have survived Judge Dwyer's declaratory ruling, NFRC did not pursue them in the Seattle litigation.

■ AFRC's final argument against applying *res judicata* to bar its claims here is that issue preclusion is an equitable doctrine and that it would be inequitable to apply *res judicata* in the instant case. Plaintiffs explain that:

> [AFRC] selected this district as the forum in which to present its claims, and was compelled, over its objection, to litigate some (but not all) of its claims in the Western District of Washington in a highly-accelerated consolidated case with limited discovery and a less than complete administrative record. The unique procedural avenues employed by the *Seattle Audubon* court did not in fact address all of [AFRC]'s challenges to the Northwest Forest Plan.

Pls.' Opp'n at 33 (citation omitted).

■ AFRC fails to understand, however, that the government's motion for summary judgment is based on *res judicata*, not issue preclusion, and unlike issue preclusion, *res judicata* is not subject to equitable considerations. Moreover, even if equitable considerations were to be taken into account, the Court finds that they weigh in the government's favor. As the government states:

> [AFRC] had the opportunity to assert all of its challenges to the Forest Plan in the Seattle litigation where it was a party. Instead, it engaged in endless procedural maneuverings to evade the Seattle court's jurisdiction. Having failed to escape the Seattle court's judgment, [AFRC] has no equitable or legal basis for seeking to relitigate its claims. To the extent that any of its claims were not heard by the Seattle court, [AFRC] has only itself to blame.

Gov't Reply at 5.

Therefore, because all four of the elements of *res judicata* are satisfied as to AFRC's claims and the declaratory judgment exception for further relief for a prevailing party is inapposite, the Court concludes that the doctrine of *res judicata* bars AFRC from pursuing its objections to the Plan in this Court.

### III.

■ Acknowledging that AFRC's co-plaintiffs here were not formal parties to the Seattle litigation, the government argues nevertheless that the co-plaintiffs are also barred from litigating the same claims in this Court under a principle known as the "doctrine of virtual representation." The government asserts that it is well-established in federal courts that a litigant *and* those in privity with the litigant can be bound by an earlier judgment and precluded from bringing subsequent legal actions that raise the same issues or claims. Relying primarily on a Fifth Circuit case known as *Aerojet–General Corp. v. Askew*, 511 F.2d 710 (5th Cir.1975), and the more

recent case of *Tyus v. Schoemehl*, 93 F.3d 449 (8th Cir.1996), the government argues that AFRC and its 13 co-plaintiffs must be deemed "privies" because their interests are "so closely aligned" and were "sufficiently represented" in any case by NFRC in the Seattle litigation. In other words, NFRC was, in effect, the 13 co-plaintiffs' "virtual representative" there and should be bound as well by Judge Dwyer's judgment.

The Fifth Circuit's decision in *Aerojet–General* is most imprecise as to scope to be given to the preclusive effect that has come to be termed the doctrine of virtual representation. Without further elaboration, the *Aerojet–General* court simply stated that "[u]nder the federal law of *res judicata*, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Aerojet–General*, 511 F.2d at 719.[3]

The Eighth Circuit's decision in *Tyus* provides a more circumscribed scope for the doctrine by setting forth "guiding principles" for its application.[4] The *Tyus* court explained that

> [t]here are three generally recognized categories of nonparties who will be considered in privity with a party to the prior action and who will be bound by a

prior adjudication: (1) a nonparty who controls the original action; (2) a successor-in-interest to a prior party; and (3) a nonparty whose interests were adequately represented by a party to the original action.

*Tyus*, 93 F.3d at 454 (citation omitted). According to the Eighth Circuit, the doctrine of virtual representation, which falls under the "adequately represented" category, should be applied on a case-by-case basis using a fact-specific inquiry guided by the following factors: (1) "identity of interests between the two parties": (2) "a close relationship between the prior and present parties; [ (3) ] participation in the prior litigation; [ (4) ] apparent acquiescence; [ (5) ] whether the present party deliberately maneuvered to avoid the effects of the first action"; (6) "adequacy of representation ... viewed in terms of incentive to litigate"; and (7) "whether [the case raises] a public law issue or private law issue." *Id.* at 455–56. A court should consider these factors when it balances an aspiring litigant's right to its own day in court with the need for judicial economy.

Plaintiffs argue that the doctrine of virtual representation is an "amorphous," "opaque," and "murky" doctrine that not only has never been embraced by the Supreme Court or the D.C. Circuit, but also has been looked upon by other courts with

---

**3.** Several years later, the Fifth Circuit narrowed its interpretation of the scope of the doctrine in *Pollard v. Cockrell*, 578 F.2d 1002, 1008–09 (5th Cir.1978), by stating that, in addition to requiring a close alignment of interests, the doctrine of virtual representation also "demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues," e.g., "estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee." *Id.* at 1009 (quot-

ing *Southwest Airlines Co. v. Texas Int'l Airlines*, 546 F.2d 84, 97 (5th Cir.1977) (citations omitted)).

**4.** *Tyus v. Schoemehl* was an appeal of a Voting Rights Act § 2 challenge to redrawn voting district boundaries for the election of aldermen in the city of St. Louis. The same claims of vote dilution were made by several minority plaintiffs in successive suits. Some plaintiffs were common to both actions. Summary judgment for defendants in the earlier case was held to be preclusive of the later case.

"increasing disfavor." Plaintiffs claim that there is no agreed definition, set of factors, or clear test for applying the doctrine among the courts that have done so. To bolster their assertion, plaintiffs cite to passages in several Supreme Court decisions and numerous circuit court decisions that seem to cast doubt on the viability of the doctrine. Both the cases and the quotations are equivocal.

As the government observes, however, with the exception of the Sixth Circuit in *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877 (6th Cir.1997), no circuit has entirely rejected the notion that a nonparty can be "virtually represented" by another party in a prior case, and thus, barred from re-litigating those claims. Although some courts have criticized the doctrine for lacking a consistent scope or a common definition, the majority of courts recognize the need, under certain limited circumstances, to bar individuals from litigating claims raised and decided in cases to which they were not formally parties. Moreover, although the decisions cited by plaintiffs ultimately concluded that the litigants then before them as first-time parties should not be bound by prior judgments, those decisions were based on the particular facts of each case and did not reflect outright repudiations of the doctrine of virtual representation.

Although the D.C. Circuit has not squarely addressed the viability of the doctrine in the District of Columbia, it did mention the doctrine in a footnote in *Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, at 1411 n. 8 (D.C.Cir.1985). The court expressed some concern about the doctrine's "highly uncertain scope," but passed on the opportunity to reject it altogether. Instead, the court reviewed some of the factors other courts consider in applying the doctrine and determined that the plaintiffs in the two suits involved did not have interests that were " 'closely aligned' . . . in a way that justifies preclusion." *Id.*

For present purposes, and in the interest of judicial economy, not to mention the matters of finality and consistency of result, the Court determines that some form of virtual representation may be appropriate in this case, and it will employ the "guiding principles" enumerated in *Tyus* in analyzing whether the doctrine of virtual representation bars the claims of AFRC's co-plaintiffs. These seven factors not only include the five "special factors" mentioned by the D.C. Circuit in *Ethnic Employees*—closely aligned interests, participation in the prior litigation, consent to be bound, tactical maneuvering, and close relationships—but also incorporate two other important factors analyzed in other virtual representation cases—adequacy of representation and involvement of public law issues. The *Tyus* guiding principles are the most comprehensive expression to be found of the considerations that a court should weigh when determining whether to preclude a nonparty from re-litigating an adjudicated claim.

First, the "identity of interests" factor weighs strongly in favor of applying virtual representation in this case. AFRC (a party in the Seattle litigation) and its 13 co-plaintiffs (parties in the current litigation) have essentially identical interests because they share the same objection to the Northwest Forest Plan; namely, each believes the Plan does not permit enough timber harvesting or the attendant road construction on BLM forest lands. *See* Second Am. Compl., ¶¶ 3–17. Several co-plaintiffs are lumber companies that derive income directly from logging operations. Two are affiliates of public education systems dependent upon tax revenue from forest product industries. Others are employees whose wages are paid by the same

industries. Still others are wholesale or retail merchants dependent upon sales of forest products. One is a labor union whose members work for industry employers. Three are individuals who need logging roads for access to their sources of livelihood or recreation. Each of AFRC's co-plaintiffs was in being, fully cognizant at the time of the Seattle litigation of the extent to which the Plan would inhibit its income-producing or pastime activities, and possessed the same incentive then as now to oppose it.

The several plaintiffs' affinity with one another is further demonstrated by the identical, undifferentiated relief they request. In 22 paragraphs, including a final "such other and further relief" prayer, they all ask that the Northwest Forest Plan be invalidated in all of its onerous particulars, for the same reasons, and that the government be enjoined permanently from implementing its like again. *See* Second Am. Compl., "Request for Relief," ¶¶ 1–22.

In short, each plaintiff has been and continues to be harmed, economically or otherwise, by precisely the same impact of the Northwest Forest Plan upon its particular pursuits, namely, the diminution of lumbering operations on BLM timberlands, as it was in April of 1994.

The extent to which these co-plaintiffs participated in the Seattle litigation itself is not altogether clear. The Seattle litigation was decided on cross-motions for summary judgment. How, and in what respects NFRC may have availed itself of help in that case from any of AFRC's co-plaintiffs here is not apparent from the record, nor is the extent to which the co-plaintiffs were consulted (and/or heeded) in connection with NFRC's litigation strategy. It suffices for the purpose, however, to observe that all but two of AFRC's current co-plaintiffs here have been parties to *this* action since its inception in 1994, when the Seattle litigation had been two years in progress. Nothing prevented their active participation in the Seattle litigation had they possessed any doubts about NFRC's capability to represent their interests to maximum extent. They were, moreover, aware of this Court's desire and intent that all objections to the Plan be resolved in a single proceeding, and that if possible the proceeding be in the Western District of Washington, where the Seattle litigation was already fairly underway, in much closer proximity to both the subject matter of and the population most acutely affected by the Plan. Once transfer of the *Thomas* case had been effected, the co-plaintiffs acquiesced in its voluntary dismissal and joined in the motion to this Court to enjoin the prosecution of the government's cross-claims against NFRC in the Seattle litigation, presumably to avert a definitive decision in the Western District of Washington in hope of a more favorable reception in the District of Columbia. And when that motion was denied, they were content to allow NFRC to go it alone.[5]

---

**5.** The Eighth Circuit faced similar "tactical maneuvering" in *Tyus* where the plaintiffs in the first lawsuit ("Alderman plaintiffs") filed a second suit asserting the same claims, but simply added several new plaintiffs ("Miller plaintiffs"). In precluding the plaintiffs who had been added to the second suit from litigating their claims, the court explained:

This second lawsuit directly contravenes the policies supporting the preclusion doctrines. A victory by the Alderman plaintiffs in the [first] suit would have directly benefitted the Miller plaintiffs. On the other hand, without virtual representation, a loss by the Alderman plaintiffs would cause no harm to the Miller plaintiffs. In such a situation, there is no incentive to intervene. Quite the contrary: holding preclusion inapplicable assures that a party would not intervene, for it would allow various mem-

■ Notwithstanding plaintiffs' assertion to the contrary, the relationship between AFRC and the 13 co-plaintiffs need not rise to the level of an "express or implied legal relationship" or even a "special relationship," as some circuit court opinions have required. *See, e.g.,* n. 3, *supra.* To the contrary, both the D.C. Circuit in *Ethnic Employees* and the Eighth Circuit in *Tyus* simply speak of a "close relationship" between prior and present parties for whom the former is alleged to be the virtual representative. Certainly, the relationship between AFRC and the 13 co-plaintiffs *within the context of this lawsuit* is relevant when determining whether a "close relationship" exists between them. For instance, the Eighth Circuit in *Tyus* concluded that a "close relationship" existed between the prior and present parties when both suits raised similar claims, "there was an overlap in plaintiffs between the two suits," and the same counsel represented the parties in both suits. *Tyus,* 93 F.3d at 457. All three elements are present here: the claims in this case and the Seattle litigation are essentially the same; AFRC was a party in both suits; and the same attorney who represented AFRC in the Seattle litigation represents plaintiffs here. Add to that the fact that AFRC is bearing the full cost of this lawsuit, and it is reasonable to infer that AFRC and the 13 co-plaintiffs have always had a sufficiently "close relationship" to support application of the doctrine of virtual representation to the co-plaintiffs' claims.

■ Finally, aside from the "identity of interests" factor examined above, perhaps the most important consideration in this case militating in favor of preclusion is the fact that the suit raises public law issues. As the Eighth Circuit explained in *Tyus,* "in public law cases, the number of plaintiffs with standing is potentially limitless. If parties were allowed to continually raise issues already decided, public law claims 'would assume immortality.'" *Tyus,* 93 F.3d at 456 (citation omitted). In this case, plaintiffs are challenging a comprehensive land management plan covering millions of acres of government forest lands in the Pacific Northwest that potentially could be found to impact thousands of citizens in Washington, Oregon, and California, not to mention the rest of the country, in countless ways. Applying the doctrine of virtual representation in this public law case is particularly appropriate in the circumstances.

For the foregoing reasons, it is, therefore, this 19th day of September, 2001.

ORDERED, that the defendant's motion for summary judgment is granted; and it is

FURTHER ORDERED, that the Clerk of Court shall forthwith enter final judgment for defendant dismissing the complaint with prejudice.

---

bers of a coordinated group to bring separate lawsuits in the hope that one member of the group would eventually be successful, benefitting the entire group.
*Tyus,* 93 F.3d at 457. *See also Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751, 761 (1st Cir. 1994) (noting that courts have applied the doctrine of virtual representation when they "detected tactical maneuvering designed unfairly to exploit technical nonparty status in order to obtain multiple bites of the litigatory apple").