RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

VENTAS, INC.,
  *Plaintiff-Appellee/Cross-Appellant,*

  *v.*

HCP, INC., fka Health Care Property
Investors, Inc.,
  *Defendant-Appellant/Cross-Appellee.*

Nos. 09-6385/6413

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 07-00238—John G. Heyburn II, District Judge.

Argued: March 10, 2011

Decided and Filed: May 17, 2011

Before: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Jeffrey A. Lamken, MOLOLAMKEN LLP, Washington, D.C., for Appellant. David J. Bradford, JENNER & BLOCK LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Jeffrey A. Lamken, MOLOLAMKEN LLP, Washington, D.C., Sheryl G. Snyder, FROST BROWN TODD LLC, Louisville, Kentucky, Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, Mark C. Hansen, Aaron M. Panner, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., for Appellant. David J. Bradford, Terri L. Mascherin, Daniel J. Weiss, JENNER & BLOCK LLP, Chicago, Illinois, Paul M. Smith, JENNER & BLOCK LLP, Washington, D.C., Eric L. Ison, Holland N. McTyeire V, GREENEBAUM DOLL & McDONALD PLLC, Louisville, Kentucky, for Appellee.

  CLAY, J., delivered the opinion of the court, in which GRIFFIN, J., joined. MERRITT, J. (p. 54), delivered a separate opinion concurring in the result and much of the reasoning of the majority opinion.

---

## OPINION

---

CLAY, Circuit Judge.  In this diversity action, Defendant HCP, Inc. appeals a $101,672,807.00 judgment entered by the district court for Plaintiff Ventas, Inc. following a jury trial on Ventas' claim of tortious interference with a prospective advantage, and Ventas cross-appeals.  HCP attacks the judgment on the basis of *res judicata*; the sufficiency of the evidence; and the jury instructions.  Ventas seeks to augment the judgment with punitive damages, additional compensatory damages, and prejudgment interest.

For the reasons discussed below, the judgment of the district court is **AFFIRMED**, but the district court's decision to preclude Ventas from seeking punitive damages is **REVERSED**, and the case is **REMANDED** with instructions that the matter proceed to trial on the single issue of punitive damages.  The judgment as previously entered by the district court shall stand as a partial final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

## BACKGROUND

In late 2006, Sunrise Senior Living Real Estate Trust ("Sunrise"), a Canadian real estate investment trust, conducted a confidential auction of its assets.  The parties to this appeal, Plaintiff Ventas, Inc. ("Ventas") and Defendant HCP, Inc. ("HCP"), both large American real estate investment trusts specializing in healthcare-related properties, participated in the auction.  The auction was to proceed in two rounds.  During the first round, several prospective buyers, including Ventas and HCP, would be invited to submit non-binding bids to acquire Sunrise.  From these initial bids, Sunrise would select a smaller group of prospective buyers to participate in the second round, in which each remaining participant could submit a final bid.  Sunrise would enter into a purchase

agreement with the winning bidder, subject to approval by two thirds of Sunrise's voting unitholders.[1]

The auction procedures required each participant to sign a confidentiality agreement, which included a standstill provision ("Standstill Agreement") that would, among other things, prohibit the participant from making or announcing any bid outside of the auction process for a period of 18 months following the conclusion of the auction. The Standstill Agreement also proscribed any actions that would require Sunrise to publicly announce a bid outside of the auction process.

As invitees to the preliminary stages of the auction, both Ventas and HCP independently negotiated and entered into Standstill Agreements with Sunrise. Neither was a party to the other's Standstill Agreement. HCP's Standstill Agreement permitted HCP to make only one final bid, but Ventas' Standstill Agreement permitted Ventas to make a second final bid if Sunrise accepted a competing offer after Ventas made its initial final bid.

Ventas and HCP each made a preliminary bid for Sunrise. HCP offered $16.25 per unit, and Ventas offered $13.25 per unit.[2] Each bid was expressly conditioned upon the bidding party reaching an agreement with Sunrise Senior Living, Inc. ("SSL"), a third party that managed Sunrise's properties under long-term management contracts. Following a review of the preliminary bids, Sunrise invited Ventas and HCP to proceed to the second round. Ventas and HCP were the only participants in the second round.

During this round, Sunrise required each party to submit a final, binding bid by January 14, 2007. The requirement of a binding bid had the practical effect of forcing a bidding party to first reach an independent agreement with SSL. As the district court explained, "[g]iven the complex agreements that provide SSL with rights that encumber, restrain, and burden Sunrise [] and the Sunrise [] properties, it is easy to see why Sunrise

---

[1] A unitholder is an owner of units in an investment trust, similar to a shareholder owning shares in a corporation.

[2] All dollar amounts hereinafter are in Canadian currency unless otherwise indicated.

[] would desire to have its buyer establish the feasibility of taking ownership of Sunrise [] prior to submitting a final bid, rather than later citing inability to work with SSL as a reason for backing out of the sale." (R. 34 at 2 n.2.)

Ventas reached an agreement with SSL, but HCP failed to do so. Although HCP and SSL engaged in negotiations, the negotiations "blew up" just prior to the final bid deadline. (Tr.4B at 69.) It appears that negotiations collapsed when issues relating to another real estate portfolio became intertwined in the Sunrise negotiations. This other portfolio, referred to as the "CNL Properties," was a multi-billion dollar property portfolio purchased by HCP in 2006 and managed by SSL. (Tr.2B at 23.) During the negotiations, HCP "had an existing signed agreement with [SSL] on [the] CNL portfolio but that was under negotiation to be revised." (Tr.4B at 70.) In its negotiations regarding the CNL Properties, HCP sought to "get the cost structure of [SSL] consistent with the cost structure of other senior housing operators." (Tr.5A at 77.)

The parties dispute the source of the breakdown in negotiations between HCP and SSL. Each assigns fault to the other. According to HCP, it had "reached an agreement" with SSL as to the Sunrise properties "early the week of January 8th" (Tr.4B at 69), but SSL, at the eleventh hour, demanded "concessions in separate negotiations concerning other properties." (HCP Br. at 6 (citing Tr.4B at 69; Tr.5B at 42).) This, HCP contends, doomed the negotiations because the cost of the concessions "approached $200 million." (Tr.4B at 129.)

According to Ventas, it was HCP, not SSL, that derailed the negotiations. HCP Chairman and Chief Executive Officer ("CEO") Jay Flaherty admitted that he was playing "hardball" with SSL during the negotiations by, for instance, sending numerous notices to SSL that terminated, or purported to terminate, management contracts with SSL relating to other properties owned by HCP. (Tr.5A at 75-82.) The night before the final bid deadline, at 8:00 p.m. on January 13, 2007, HCP sent SSL a counter-proposal that included substantially different terms than the parties had previously discussed. (R. 481 at 267-78.)

A senior vice president at SSL, Christopher Feeney, recalled that HCP's last-minute proposal included a 30-year right of first offer on development properties. (*Id.* at 268-75.) Feeney explained that the proposed terms were unacceptable—"actually worse" than HCP's prior proposal—and remarked, referring to HPC: "I had never had seen a party engage in a series of negotiations and then introduce something that is completely out of left field with the hope of signing it in a day." (*Id.*) Feeney concluded that HCP was not "acting in good faith." (*Id.* at 277.) SSL informed HCP via email that it would not agree to the proposed terms; HCP did not respond. (*Id.* at 277-78.) At the time of trial, HCP was embroiled in litigation against SSL to terminate certain management contracts. (Tr.5A at 107.)

HCP withdrew from the auction process after it was unable to reach an agreement with SSL. Although Sunrise offered to "provide some additional time" for HCP to attempt to reach an agreement with SSL, HCP CEO Flaherty "indicated that, no, that they were moving on to other things." (Tr.2A at 39.) At that time, Andrew Phillips, a financial advisor to Sunrise, asked Flaherty "if there was a different price, that is, a lower price, at which he would be prepared to offer that would somehow offset any risk that HCP might be taking by going into a transaction" without having reached a deal with SSL. (*Id.*) Flaherty responded, "no, that . . . his board . . . had indicated that th[e] agreement had to be completed." (*Id.*)

On January 14, 2007, having reached an agreement with SSL, Ventas submitted an unconditional bid to acquire Sunrise at $15.00 per unit, for a total purchase price of $1,137,712,410.00. Ventas' offer of $15.00 per unit was approved by the Sunrise Board of Trustees that same day, and Ventas and Sunrise entered into a binding agreement (the "Purchase Agreement"), in which Ventas agreed to purchase Sunrise for $15.00 per unit, subject to approval by two-thirds of Sunrise's voting unitholders. Section 4.1 of the Purchase Agreement required Sunrise to use best efforts to secure unitholder approval of the Purchase Agreement. Although Sunrise remained free to respond to unsolicited offers, Section 4.4 required Sunrise to abstain from activities in furtherance of alternative bids and to enforce any existing Standstill Agreements with third parties.

On January 15, 2007, Sunrise and Ventas publicly announced the Purchase Agreement in a press release. Shortly thereafter, Sunrise informed HCP of the existence of the Purchase Agreement and of the continued viability of the Standstill Agreement between HCP and Sunrise. The Canadian financial markets reacted positively to the news of the proposed acquisition: units of Sunrise, which had been trading at approximately $10.50 per unit during the confidential auction, increased to approximately $15.00 per unit after the deal was announced.

Initially, unitholder approval of the Purchase Agreement seemed to be a foregone conclusion. (*See, e.g.*, Tr.7A at 87-99 (testimony of Ventas' expert, opining that the Ventas offer had a 95% expectation of approval).) The offer represented the "full price" of Sunrise. (Tr.6A at 80.) The 50% premium over Sunrise's market price before the deal was "record-breaking." (Tr.3A at 80.) No similar deal had ever been rejected by Canadian shareholders. (Tr.11A at 124-25.)

In the weeks following the public announcement of the Purchase Agreement, Sunrise CEO Doug MacLatchy suggested to HCP CEO Flaherty via email that HCP make a bid for Sunrise. (R. 485-2 at 384-85.) According to HCP, from approximately January 15, 2007 until February 1, 2007, HCP "went intensively to work with [SSL] to remove the obstacle that had been thrown at [HCP] at the 11th hour on Saturday, January 13th, which related to" the CNL Properties. (Tr.5B at 38.) On February 13, 2007, the HCP Board approved a conditional bid of $18.00 per unit for Sunrise. (*Id.* at 55-56.)

On February 14, 2007, Flaherty advised Sunrise's investment banker that HCP would make an offer of $18.00 per unit, and sent Sunrise a letter explaining the details of HCP's offer and included an unsigned and unconditional purchase agreement. HCP did not disclose that its offer was conditioned on reaching an agreement with SSL.

Sunrise requested that HCP refrain from publicly announcing its offer of $18.00 per unit. That request notwithstanding, HCP issued the following press release on February 14, 2007:

> Health Care Property Investors, Inc. (NYSE: HCP) today announced that it has submitted a proposal to acquire the assets of Sunrise Senior Living Real Estate Investment Trust (TSX: SZR.UN) in a transaction that values each Sunrise [] unit at Cdn$18.00. HCP's offer price represents a 20% premium over the Cdn$15.00 price being offered in Sunrise[]'s proposed sale to Ventas, Inc.
>
> To underscore the clear superiority of its offer, HCP proposes to enter into an acquisition agreement that reflects its significantly higher price and is otherwise identical to the agreement between Sunrise [] and Ventas. HCP's offer values the equity of Sunrise [] at appropriately Cdn$1.4 billion.
>
> HCP's offer has been unanimously approved by HCP's Board of Directors. The offer is not subject to any due diligence or financing contingencies. Because of HCP's superior financial condition and access to funds and its experience in large acquisitions, HCP believes that its proposed acquisition of Sunrise [] has greater certainty of completion than the proposed Ventas transaction.

(App. at 454.) The press release also included a copy of the offer letter that Flaherty sent to Sunrise, which stated that HCP was "confident" that it could "enter into arrangements with [SSL] on terms comparable to those entered into by Ventas." Ventas believed that the press release and offer were in violation of the Standstill and Confidentiality Agreements that HCP had with Sunrise.

After HCP issued this press release, Sunrise became concerned about whether HCP's bid contained an undisclosed condition, particularly because HCP had not signed the proposed purchase agreement. Ventas presented evidence at trial that HCP informed Sunrise on numerous occasions that it would transmit a signed, unconditional purchase agreement, but failed to ever do so. At one point, Flaherty told Sunrise that he had actually sent the signed agreement via Federal Express. Sunrise's concerns were soon borne out: later that evening, HCP disclosed to Sunrise that its bid was conditioned upon reaching an agreement with SSL.

Before the markets opened on February 15, 2007, Sunrise issued a press release stating that Sunrise would not consider the offer from HCP until "such time as it receives

a confirmation from HCP that their proposal is not conditional on [HCP] reaching an agreement with [SSL]." (*Id.* at 1240; *see also* Tr.2A at 98.)

Once the markets opened on February 15, 2007, the first day of trading since HCP publicly announced its offer of $18.00 per unit, the price of Sunrise increased from approximately $15.00 per unit to approximately $18.00 per unit in the largest trading day in the history of Sunrise. Within two business days of the press release, approximately 40 million units of Sunrise had been exchanged, representing nearly 60% of Sunrise's total outstanding units. Ventas presented evidence that arbitragers from the U.S. had begun to purchase the units of Sunrise.

On February 18, 2007, HCP proposed to SSL that they enter into an agreement that HCP presented as nearly "identical" to the agreement that SSL had reached with Ventas. The proposed agreement, however, demanded certain development rights previously rejected by SSL, and that SSL was unlikely to accept in any future negotiations. (Tr.2A at 107; Tr.3A at 64-66; Tr.3B at 126; Tr.5A at 93-96; R. 481 at 310-313.)

Sunrise issued a second press release on February 19, 2007, stating that the HCP offer was "expressly conditional on HCP entering into" an agreement with SSL, as "certain agreements among the various parties" prevent HCP from negotiating with SSL. (App. at 590; Tr.11A at 49-50.)

On February 20, 2007, HCP informed Sunrise that HCP had proposed an agreement to SSL that was "materially the same" as the agreement between SSL and Ventas. (Tr.5A at 130.) This prompted Sunrise to issue a press release on February 21, 2007, stating that HCP had amended its offer to include an express condition. The press release also stated that HCP "indicated that they are prepared to enter into an agreement with Sunrise Inc. on the terms HCP purports are substantially similar to the agreement entered into between Ventas, Inc. and Sunrise, Inc." (App. at 730A.) Ventas issued its own press release on February 22, 2007, in which Ventas stated that HCP's offer was barred by the Standstill Agreement, and was a conditional offer that was in fact less favorable than its own. (*Id.* at 1228.)

Amidst this flurry of press releases, on February 21, 2007, HCP submitted a proposal to purchase another company, identified as "Slough," for $3.1 billion. (Tr.4B at 96.) HCP did not issue a press release relating to this proposed acquisition. (*Id.*; Tr.9A at 73.) The Slough deal would be announced publicly months later, after which Standard & Poors would immediately place HCP's credit and senior notes on "credit watch." (Tr.9A at 73.)

Meanwhile, Sunrise and Ventas each filed applications in the Ontario Superior Court of Justice, Canada ("Ontario Superior Court"), seeking declarations regarding the continued validity of HCP's Standstill Agreement.[3] Sunrise, which filed its application on February 19, 2007, sought to clarify whether HCP was permitted to negotiate with SSL. Ventas likewise filed an application on February 21, 2007, seeking a declaration that Sunrise was obligated to enforce its Standstill Agreement with HCP.

On March 5, 2007, the Ontario Superior Court ruled as follows: 1) Sunrise must enforce its Standstill Agreement with HCP; 2) the Purchase Agreement was reasonably designed to ensure enforcement of the Standstill Agreements; 3) neither the Standstill Agreement with HCP nor any subsequent action by Sunrise authorized HCP to submit a late bid; and 4) Sunrise conducted the auction in a manner consistent with the Standstill Agreement. As a result of this ruling, on March 7, 2007, HCP withdrew its offer to purchase Sunrise.

Voting on the Purchase Agreement began on or around March 7, 2007, when Sunrise mailed ballots and proxy statements to its unitholders. Four of the largest institutional unitholders—ING, Caisse, Cypress, and Morgan Stanley, which collectively controlled approximately 39% of the vote—voted against the Purchase Agreement. (App. at 1315-17.)

On March 26, 2007, during the voting period, the Ontario Court of Appeal affirmed the decision of the Ontario Superior Court, holding as follows: 1) the HCP

---

[3]Additionally, on April 5, 2007, Ventas filed an action against Sunrise in the Canadian courts, claiming damages of $250 million from Sunrise's efforts to facilitate HCP's bid. This matter was resolved with Ventas' ultimate purchase of Sunrise for $16.50 per unit.

Standstill Agreement precluded HCP from submitting a subsequent bid and the Purchase Agreement required Sunrise to enforce the HCP Standstill Agreement; 2) the requirement that Sunrise enforce the Standstill Agreement against HCP is balanced and objectively reasonable in the context of the auction; and 3) Sunrise acted reasonably in designing and conducting the auction process so as to maximize value.

By April 9, 2007, a sufficient number of proxies had been entered against the Purchase Agreement to prevent its approval. (Tr.4A at 119; App. at 742.) On April 11, 2007, to salvage the deal and avoid injury to its reputation, Ventas increased its original offer of $15.00 per unit to $16.50 per unit. The unitholders approved Ventas' increased offer on April 19, 2007, and the deal closed on April 26, 2007.

Ventas commenced this diversity action under 28 U.S.C. § 1332 soon thereafter. On May 3, 2007, Ventas filed a Complaint against HCP in the district court, asserting Kentucky state law claims of tortious interference with contract, and tortious interference with a prospective advantage. Ventas alleged that HCP improperly interfered with its valid expectancy that the Sunrise unitholders would approve its $15.00 per unit offer to purchase Sunrise, causing Ventas to raise its offer to $16.50 per unit.

On July 2, 2007, HCP moved to dismiss the Complaint, arguing *res judicata* and failure to state a claim. The district court denied the motion. On July 25, 2008, the district court granted HCP leave to file counterclaims against Ventas, alleging that Sunrise—whose liabilities Ventas had assumed—misled HCP about the fairness of the auction process. On March 25, 2009, upon Ventas' motion for judgment on the pleadings, the district court dismissed HCP's counterclaims, reasoning that HCP's allegations were not cognizable under Kentucky law.

On May 14, 2009, the parties cross-moved for summary judgment. HCP argued that *res judicata* precluded Ventas' claims and that Ventas could not prove tortious interference with contract. Ventas sought summary judgment on its claim of tortious interference with a prospective advantage, as well as on HCP's "non-damages affirmative defenses." Ventas also sought resolution of numerous issues of collateral estoppel stemming from the Canadian litigation.

In a memorandum and opinion dated July 15, 2009, the district court granted summary judgment for HCP on Ventas' claim of tortious interference with contract, but permitted Ventas' claim of tortious interference with a prospective advantage to proceed to trial. In so doing, the district court held that Ventas could not seek consequential damages based on increased financing costs that it incurred as a result of any delay in the closing of the Sunrise auction. Additionally, the district court once again rejected HCP's claim of *res judicata*.

A jury trial commenced on August 18, 2009 and lasted until September 4, 2009. On August 28, 2009, the district court granted judgment as a matter of law for HCP on the issue of punitive damages, holding that Ventas had not presented sufficient evidence to present the issue to the jury.

Towards the end of the trial, the parties contested the substance of the jury instructions. The central issue was whether the district court should instruct the jury in accordance with § 767 or § 768 of the Restatement (Second) of Torts. Both sections impose liability for tortious interference, but § 767 is a generally applicable section, while § 768 treats tortious interference as between competitors and imposes a higher standard for liability. The district court resolved the question in favor of § 768, but also instructed the jury as to "some of the factors enumerated in section 767 [as] helpful guideposts for examining the alleged wrongfulness of HCP's actions." The district court also held, as a matter of law, that: 1) Ventas and HCP were competitors; 2) the actions of Ventas and HCP did not "create or continue an unlawful restraint of trade;" and 3) the purpose of any tortious interference by HCP was "at least in part to advance [HCP's] interest in competition." (R. 450 at 6 n.5.)

On September 4, 2009, the jury returned a verdict for Ventas in the amount of $101,672,807.00 (U.S.), apparently calculating Ventas' damages as follows:

| | |
|---|---|
| Purchase Agreement Price | $15.00 / unit |
| Actual Purchase Price | $16.50 / unit |
| Difference (damage) | $1.50 / unit |
| Number of Units Outstanding | 75,847,494 |
| Damage to Ventas (units x damage per unit) | $113,771,241.00 |

| | |
|---|---|
| Conversion Rate (4/26/07) | $1.00 (Can.) = $0.89366 (U.S.) |
| **Total Damages (U.S.)** | **$101,672,807.00 (U.S.)** |

(*See* Tr.7A at 59.) (The district court, not the jury, performed the currency conversion.)

The parties filed post-trial motions. HCP sought judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure based on the sufficiency of the evidence, and, once again, *res judicata*. HCP alternatively sought a new trial based on claimed deficiencies in the jury instructions; erroneous evidentiary rulings; and the overall weight of the evidence. Ventas moved to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure, requesting that the district court: 1) convert damages from Canadian to U.S. dollars as of the date of judgment rather than the date of injury; and 2) award prejudgment interest on the jury verdict. On November 16, 2009, the district court denied both parties' post-trial motions. This timely cross-appeal followed.

## DISCUSSION – APPEAL BY HCP

The Court first turns to the issues that HCP raises on appeal. HCP argues that the district court erroneously: 1) concluded that Ventas' claims were not barred by *res judicata*; 2) instructed the jury on the elements of "improper interference" and "but-for" causation; and 3) denied HCP judgment as a matter of law on the element of causation. Because we find that these arguments lack merit, we **AFFIRM** the judgment below in its entirety.

## I.      Res Judicata

We begin our analysis with HCP's argument that Ventas' claim is barred by the doctrine of *res judicata*. According to HCP, Ventas could have—and should have—asserted its tortious interference claims when it filed its application in the Ontario Superior Court on February 21, 2007. The district court rejected this argument, and we now **AFFIRM**.

### A.      Standard of Review and Legal Standard

The district court's application of the doctrine of *res judicata* is reviewed *de novo. Bragg v. Flint Bd. of Educ.*, 570 F.3d 775, 776 (6th Cir. 2009).  Under Kentucky law,[4] *res judicata* consists of two distinct components, claim preclusion and issue preclusion.  Kentucky courts generally follow the Restatement (Second) of Judgments (1982) for purposes of applying *res judicata.*[5]  This appeal raises only claim preclusion, which, under Kentucky law, bars the litigation of "entire claims that were brought or should have been brought in a prior action."  *Morgan v. Standard Elec. Co., Inc.*, 62 F. App'x 110, 111 (6th Cir. 2003).  Under Kentucky law, for claim preclusion to bar a subsequent action:

> First, there must be identity of parties.  Second, there must be identity of the two causes of action.  Third, the action must be decided upon its merits.  In short, the rule of res adjudicata does not act as a bar if there are different issues or the questions of law presented are different.  Likewise, it has long been recognized that a party may not split his cause of action, therefore, if a cause of action should have been presented and the party failed to do so and the matter should again arise in another action, it will be held that the first action was res adjudicata as to all causes that should have properly been presented.

*Newman v. Newman*, 451 S.W.2d 417, 419 (Ky. 1970).

---

[4] A federal court sitting in diversity applies the choice of law rules of the forum state to determine questions of *res judicata*.  *See Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007).  Here, the parties did not brief whether Kentucky, as the forum state, would apply its own *res judicata* law or that of Ontario in determining the preclusive effect of the prior Canadian action.  The parties have instead assumed, as did the district court, that Kentucky and Ontario would apply the same rules of *res judicata*.  For purposes of this appeal, we need not disturb this assumption.  *See C.D. Herme, Inc. v. R. C. Tway Co.*, 294 S.W.2d 534, 538 (Ky. 1956) (holding that where the parties fail to argue that the law of a jurisdiction other than Kentucky governs, the Kentucky Supreme Court will "assume[] that the [law of the other jurisdiction] is the same as that of Kentucky.").

[5] *See, e.g.*, *Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808, 813 (W.D. Ky. 2003); *Coomer v. CSX Transp., Inc.*, 319 S.W.3d 366, 371 & n.9, 14, 31 (Ky. 2010); *Berrier v. Bizer*, 57 S.W.3d 271, 280-81 (Ky. 2001); *Yeoman v. Commonwealth Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998); *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 193 (Ky. 1994); *Watts By and Through Watts v. K, S & H*, 957 S.W.2d 233, 237 (Ky. 1997); *ESI Cos., Inc. v. Ray Bell Const. Co. Inc.*, No. 2008-CA-00176-MR, 2009 WL 4060478, at *8 (Ky. Ct. App. Nov. 25, 2009); *Parker v. Carrington*, No. 2004-CA-002614-MR, 2006 WL 2517898, at *2 (Ky. Ct. App. Sept. 1, 2006); *Black v. CMT Trucking*, No. 2004-CA-001079-WC, 2005 WL 267568, at *5 (Ky. Ct. App. Feb. 4, 2005); *Wheeler v. Wheeler*, 154 S.W.3d 291, 294 (Ky. Ct. App. 2004); *Hauling v. Powell*, No. 2002-CA-002340, 2003 WL 21204976, at *6 (Ky. Ct. App. May 23, 2003); *Dennis v. Fiscal Court of Bullitt Cnty.*, 784 S.W.2d 608, 609-10 & n.2 (Ky. Ct. App. 1990); *Rev. Cabinet, Commonwealth of Ky. v. Samani*, 757 S.W.2d 199, 202 (Ky. Ct. App. 1988).

**B.      Application**

The district court concluded that *res judicata* is inapplicable because Ventas' claim of tortious interference was not ripe on February 21, 2007, when Ventas filed its application in the Ontario Superior Court.  The district court relied upon the well-settled principle that *res judicata* "cannot be used to cut off a cause of action before it accrues." *Watts By & Through Watts*, 957 S.W.2d at 237.  On appeal, the parties dispute whether Ventas' claims of tortious interference were ripe on February 21, 2007.

The parties and the district court, however, have overlooked the well-settled rule that an action for declaratory relief does not have preclusive effect in a subsequent litigation between the same parties.  Under § 33 of the Restatement (Second) of Judgments,

> [a] plaintiff who wins declaratory judgment may go on to seek further relief, even in an action on the same claim which prompted the action for a declaratory judgment.  This further relief may include damages which had accrued at the time the declaratory relief that could have been requested initially.

Restatement (Second) of Judgment § 33, cmt. (c).  The Restatement expressly permits claim splitting where, as here, the first action sought only declaratory relief.  *Id.* (stating that "a declaratory action determines only what it actually decides and does not have a claim preclusive effect on other contentions that might have been advanced.").

Consistent with Kentucky's general adherence to the Restatement (*see supra* note 5 (collecting cases)), Kentucky has "adopted essentially the same rule [as Restatement § 33]," even though Kentucky has done so without expressly referencing the Restatement. *See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 56 (1st Cir. 2008) (discussing Kentucky law).  In *Cooke v. Gaidry*, 218 S.W.2d 960 (Ky. 1949), for example, the Kentucky high court held that "suits for declaratory judgments" under state law do not fall within the general rule that "a former judgment is conclusive not only of all matters actually adjudicated thereby, but in addition, as to all matters which could have been presented for adjudication in the original action." *Id.* at 961-62

(holding that prior declaratory judgment action on a lease did not preclude a subsequent action for damages). The rule as stated in *Cooke* is oft-repeated and is now well-settled Kentucky law.**6** *See, e.g.*, *Holbrook v. Shelter Ins. Co.*, 186 F. App'x 618, 622 (6th Cir. 2006); *City of Paducah v. Elec. Plant Bd. of the City of Paducah*, 449 S.W.2d 907, 910 (Ky. 1970).

It is undisputed in the instant case that the prior proceedings in Canada were declaratory in nature. (HCP Br. at 13; Ventas Br. at 62.) In fact, the Ontario Superior Court expressly stated that Ventas "applie[d] for a declaration" as to the parties' obligations under the various agreements. *See Ventas, Inc. v. Sunrise Senior Living Real Estate Invest. Trust*, 07-CL-6893 (Ont. Sup. Ct. Mar. 6, 2007). It is thus clear that the prior Ontario action does not have preclusive effect under Kentucky law,**7** and does not bar Ventas' present tort action against HCP. *See Stericycle*, *Inc. v. City of Delavan*, 120 F.3d 657, 659 (7th Cir. 1997) ("The effect of such a declaration . . . is not to merge a claim in the judgment or to bar it.") (internal quotation marks and citation omitted).

Accordingly, we **AFFIRM** the decision of the district court decision as a matter of Kentucky law, declining to accord preclusive effect to the prior Canadian litigation. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002) ("[W]e are free to affirm the judgment on any basis supported by the record.").

---

**6**The Kentucky rule is consistent with the majority rule. As the First Circuit recently noted, the "vast majority of states that have addressed this problem unapologetically apply a special rule of claim preclusion, consistent with that of section 33 of the Second Restatement, in the declaratory judgment context." *Hartford Fire Ins. Co.*, 547 F.3d at 56; *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 196 (2d Cir. 2010); *Am. Forest Council v. Shea*, 172 F. Supp. 2d 24, 29 (D.D.C. 2001) ("Where a party asks only for declaratory relief, courts have limited the preclusive effect to the matters declared, hence permitting a later action seeking coercive relief based on the same cause of action.").

**7**As noted *supra* note 4, the Court assumes, as the parties and district court did, that Kentucky law governs the application of *res judicata* in this case. Nonetheless, even if Ontario law so governed, it appears that Ontario law would not give the prior action preclusive effect. (*See, e.g.*, R. 28, Ex. 9 at 8 ("The courts of Ontario, and the courts elsewhere in Canada, have been cautious about applying the cause of action estoppel branch of the doctrine of *res judicata* in circumstances in which the prior proceeding was an application . . . rather than an action.") (collecting cases) (Decl. of John W. Morden, former Assoc. Chief Justice of Ontario).)

**II.     Jury Instructions**

We now turn to HCP's argument that the district court erred as a matter of Kentucky law in its instructions to the jury.  Specifically, HCP asserts that the district court improperly instructed the jury on two of the elements of tortious interference under Kentucky law, namely "improper interference" and "but-for" causation.  As we explain below, we find no error in the district court's jury instructions.

**A.     Standard of Review**

We review the "legal accuracy of jury instructions de novo," *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010), and the denial of a proposed jury instruction for abuse of discretion.  *See United States v. Adams*, 583 F.3d 457, 468-69 (6th Cir. 2009).  Reversal of a judgment on the basis of an erroneous jury instruction may occur "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial."  *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (internal quotation marks and citation omitted).

**B.     Tortious Interference Under Kentucky Law**

Because the district court's jury instructions were based on Kentucky law, we first review the relevant state law on which the jury was instructed.  Under Kentucky law, liability for tortious interference arises when a party improperly interferes with a valid expectancy of another.  *See Nat'l Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988).  In *Hornung*, the Kentucky Supreme Court first recognized the tort, expressly adopting §§ 766, 767 and 773 of the Restatement (Second) of Torts.  *Id.*

Section 766B sets forth the basic elements of a tortious interference claim:

**§ 766B:   Intentional Interference with Prospective Contractual Relation**
One who intentionally and *improperly interferes* with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a

third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (emphasis added).

Section 767 elaborates on the element of "improper interference" set forth in § 766B:

> **§ 767.  Factors In Determining Whether Interference Is Improper**
> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>> (a) the nature of the actor's conduct,
>> (b) the actor's motive,
>> (c) the interests of the other with which the actor's conduct interferes,
>> (d) the interests sought to be advanced by the actor,
>> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>> (f) the proximity or remoteness of the actor's conduct to the interference and
>> (g) the relations between the parties.

*Id.* § 767.   Summarizing these factors, the Kentucky Supreme Court has held that "improper interference" under § 766B requires the plaintiff to "'show malice or some significantly wrongful conduct.'"  *Leo J. Brielmaier Co. v. Newport Hous. Auth.*, 173 F.3d 855 (6th Cir. 1999) (table) (quoting *Hornung*, 754 S.W.2d at 859); *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991) (defining "unlawful means" as including fraud, deceit, and coercion).

In the case of a tortious interference claim between competitors, § 768 holds plaintiffs to a more exacting standard.  Section 768 makes clear that "competition is not an improper basis for interference," Restatement (Second) of Torts § 768, cmt. (a), and provides, in pertinent part:

> **§ 768. Competition As Proper or Improper Interference**
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor . . . *does not interfere improperly* with the other's relation if

> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ *wrongful means* and
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768 (emphasis added). It is unclear whether the Kentucky Supreme Court would apply § 768, or how § 768 may otherwise impact the factors set forth in § 767.

### C.    Jury Instructions

HCP requested that the district court instruct the jury under § 768. Ventas objected, arguing that § 767 sets forth the proper legal standard. The district court noted that Kentucky law was unclear on this point, and proceeded to "predict how Kentucky courts would resolve which section properly articulates the analysis for the facts at issue in this case." (R. 450 at 2); *see also Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985) (stating that federal courts should look to "all relevant data" when predicting a state supreme court's decision, including state appeals court rulings, restatements of the law, academic publications, and the majority rule).

HCP argued below, as it does now on appeal, that the commentary to § 767 directs courts to apply § 768 in the case of a tortious interference claim between competitors. *See* Restatement (Second) of Torts § 767, cmt. (a). The relevant commentary states that, in cases between competitors, § 768 "supplant[s] the generalization expressed" in § 767. *Id.*

The district court held as a matter of Kentucky law that "the appropriate use of sections 767 and 768 is to apply section 768 as the test for whether the defendant's conduct was improper. However, section 767 can still be used to illuminate the requirements of section 768." (R. 450 at 4.) The district court accordingly instructed the jury pursuant to § 768, but used "some of the factors enumerated in section 767 [as] helpful guideposts for examining the alleged wrongfulness of HCP's actions." (*Id.*)

In its instructions to the jury, the district court first set forth the elements that Ventas was required to prove to prevail on its tortious interference claim:

> One, Ventas had a reasonable likelihood or probability of acquiring Sunrise [] at $15 per unit; two, HCP knew about the probable acquisition of Sunrise []; three, HCP intentionally and improperly interfered with Ventas'[] acquisition of Sunrise [] at $15 per unit; four, HCP's improper interference prevented Ventas from acquiring Sunrise [] at $15 per unit; and five, HCP's improper interference was a substantial factor in causing Ventas'[] damages.

(Tr.12B at 100.)  The district court then turned to the issue of competition:

> Ventas and HCP were business competitors generally, and were competing here to acquire Sunrise [].  Improper interference, as referenced in element number three, has a special meaning among competitors.  In these circumstances then, the only way to find in favor of Ventas is to find that HCP employed—I put it in quotes because it's a defined term—"significantly wrongful means" to interfere with Ventas'[] acquisition of Sunrise [] at $15 per unit.[8]
>
> For purposes of this instruction, "significantly wrongful means" includes conduct such as fraudulent misrepresentation, deceit and coercion.  Among other things, you may consider the parties' conduct, motive and the circumstances of the transaction to illuminate whether HCP's conduct amounts to significantly wrongful means.  To the extent you consider a party's motive in causing harm, it must be based on actual evidence of motive rather than a witness'[] opinion of another's motive.
>
> Now, as part of element number 3 . . . Ventas must also show that HCP intended to improperly interfere with the acquisition of Sunrise [].  As the word "intent" is used there, HCP's conduct must be intentional . . . HCP's conduct was intentional if its purpose was to improperly interfere with Ventas'[] acquisition of Sunrise [] or if HCP knew the improper interference was certain or substantially certain to occur.

(*Id.* at 101-02 (paragraph breaks added).)

---

[8]Although "malice" would also be sufficient to show "improper interference" under Kentucky law, the district court determined that HCP did not act with "malice" because it did not act with the sole purpose of harming Ventas.  (*See* R. 450 at 6 n.5.)  The parties do not appeal that decision.

Additionally, the district court gave the following instruction concerning the Canadian litigation between the parties:

> The parties to this action have previously resolved related issues in the Canadian court system. The important facts of these cases are as follows: In the week after HCP made its $18 topping bid, Sunrise [] sought guidance from a Canadian court in interpreting its confidentiality agreement with HCP and its purchase agreement with Ventas. In that case Sunrise [] and HCP generally took the position that the confidentiality agreement and the purchase agreement did not prohibit HCP's $18 bid. Ventas took the opposite position.

> The Canadian court found: One, HCP's confidentiality agreement precluded it from making the $18 topping bid. By making the bid, HCP breached its confidentiality agreement with Sunrise []. Two, the purchase agreement between Sunrise [] and Ventas prohibited Sunrise [] from submitting HCP's bid to its unitholders. Finally, three, Sunrise['s] auction process leading to the Ventas purchase agreement was objectively reasonable and fair.

(*Id.* at 103.) The district court then discussed the relevance of the breach of contract:

> HCP did breach its confidentiality agreement by submitting the February 14 topping bid. This fact alone is not sufficient to establish tortious interference. However, it may be considered along with the other evidence in determining whether HCP engaged in improper interference.

(*Id.* at 103-04.)

### D.     Application

HCP attacks the jury instructions on four grounds: 1) that the district court improperly blended §§ 767 and 768 of the Restatement (Second) of Torts; 2) that the instructions erroneously permitted the jury to consider HCP's breach of its contract with Sunrise as improper conduct; 3) that the district court permitted the jury to consider motive without providing the proper legal standard; and 4) that the district court failed to adequately explain the element of causation. We now review each of these assignments of error, and reject each as meritless.

### 1. "Blending" of Sections 767 and 768

HCP first argues that the jury instructions were erroneous because the district court "blended" §§ 767 and 768 instead of relying exclusively on § 768. Before considering the propriety of the district court's hybrid approach, we must consider the threshold issue of whether the district court properly looked to § 768 in the first instance. As explained below, we find no error in the district court's decision to apply § 768 as a matter of Kentucky law.

Although the Kentucky Supreme Court has not considered whether to apply § 768 in cases involving competitors, the reported cases on the issue have predicted that the state high court would apply § 768. *See, e.g.*, *Brake Parts, Inc. v. Lewis*, Nos. 09-132 & 10-212, 2011 WL 42973, at *3 (E.D. Ky. Jan. 6, 2011) ("Kentucky courts would utilize the Section 768 factors as the appropriate factors for evaluating the legality of competitive conduct."); *Midwest Agency Servs., Inc. v. JP Morgan Chase Bank, N.A.*, No. 2:09-135, 2010 WL 935450, *9 (E.D. Ky. Mar. 11, 2010) (citing *AMC of Louisville, Inc. v. Cincinnati Milacron, Inc.*, No. 3:97-CV-343, 2000 WL 33975582, at *7-8 (W.D. Ky. Jan. 25, 2000) (relying on Section 768 in considering a tortious interference claim between competitors under Kentucky law)).

We believe that these decisions make the proper prediction. Kentucky courts generally follow the Restatement (Second) of Torts, which, of course, includes Section 768, and nothing of which we are aware suggests that Kentucky courts would not apply that section under the facts of this case. Indeed, the Restatement's heightened scrutiny of claims between competitors under § 768 is consistent with Kentucky's strong interest in robust competition.[9] *See, e.g.*, *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 717 (6th Cir. 2005) ("[S]imply attempting

---

[9] Kentucky courts have consistently recognized a strong state interest in promoting competition across many areas of the law. *See, e.g., Anderson v. Jett*, 12 S.W. 670, 672 (Ky. 1889) ("Rivalry is the life of trade. The thrift and welfare of the people depend upon it."); *see also Ky. Farm Bureau Mut. Ins. Co. v. Shelter Mut. Ins. Co.*, 326 S.W.3d 803, 810 (Ky. 2010) (insurance law); *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 137 (Ky. 1969) (unfair competition); *Gen. Elec. Co. v. Am. Buyers Co-op, Inc.*, 316 S.W.2d 354, 360 (Ky. 1958) ("Our economic system is founded upon competition—'the life of trade.'"); *Love v. Kozy Theater Co.*, 236 S.W. 243, 246 (Ky. 1921).

to advance one's own legitimate economic interests at the expense of another's interests does not constitute malice.") (applying Kentucky law); *Brooks v. Patterson*, 29 S.W.2d 26, 29 (Ky. 1930) (distinguishing cases where the alleged injury resulted from an "outgrowth of competition in business" from those where it was "brought about by the exercise of either fraud or force."); *accord Carvel Corp. v. Noonan*, 350 F.3d 6, 18-20 (2d Cir. 2003) (stating that "[t]he Restatement's distinction between competitors and non-competitors is intended to strike a balance between protecting economic relationships and encouraging competitive behavior in the market.").

Having determined that Kentucky law would look to § 768 in cases between competitors, we now turn to HCP's argument that the district court erred by also considering § 767. Specifically, HCP contends that it was error to instruct the jury on certain factors listed in § 767 to define "significantly wrongful means" within the meaning of § 768. HCP's argument relies principally on commentary to § 767, which states that § 768 "supplant[s]" § 767 in cases of competitors. *See* Restatement (Second) of Torts § 767, cmt. (a). HCP contends that the word "supplant" is dispositive and renders § 768 inapplicable to claims as between competitors. We disagree with HCP's myopic reading of, and unreasonable reliance on, one word in the commentary.[10]

Section 768 does not define "wrongful means," and in fact places no limitation whatsoever on the factors that a jury might consider to determine whether the interference of a competitor was wrongful. Without any instruction regarding the meaning of "significantly wrongful conduct," the jury would have been left without any guidance. *See Bucyrus-Erie Co. v. Gen. Prods. Corp.*, 643 F.2d 413, 418 (6th Cir. 1981) ("The purpose of jury instructions is to inform the jury on the law and to provide proper guidance and assistance in reaching its verdict.").

---

[10]As the district court explained, courts have interpreted the commentary in a variety of ways. Some courts have "strictly interpreted" it to render § 767 inapplicable if the parties are competitors (R. 450 at 3 (citing, *inter alia*, *Pino v. Prudential Ins. Co. of Am.*, 689 F. Supp. 1358, 1362 (E.D. Pa. 1988)), while other courts have used the § 767 factors to supplement the standard set forth in § 768, or to provide an affirmative defense of competition. (*Id.* (citing, *inter alia*, *Buztronics, Inc. v. Theory3, Inc.*, No. 104CV1485, 2005 WL 1865512, at *6 (S.D. Ind. Aug. 5, 2005).)

In seeking guidance, the district court properly looked to § 767, as many other courts have done, to illuminate the meaning of "wrongful" conduct under § 768. *See, e.g.*, *Franklin Music v. Am. Broad. Cos., Inc.*, 616 F.2d 528, 545 (3d Cir. 1979); *Buztronics*, 2005 WL 1865512, at \*6; *White Sands Grp., L.L.C. v PRS II, L.L.C.*, Nos. 1080312 & 1080673, 2009 WL 2841114, at \*11 (Ala. Sept. 4, 2009); *Siren, Inc. v. Firstline Sec., Inc.*, No. 06-1109, 2006 WL 3257440, at \*6 (D. Ariz. May 17, 2006); *RTL Distrib., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 591 (Iowa Ct. App. 1996); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 37 (Ill. Ct. App. 1989).

Part of the same Restatement, § 767 immediately proceeds § 768, and both sections relate to tortious interference. Section 768 stands simply as "special application of the factors determining whether an interference is improper or not, as stated in § 767." Restatement (Second) or Torts § 768, cmts. (a) ("Like § 767, this Section speaks of an interference that is improper or not.") and (b). Section 768 itself refers to § 767 in its discussion of wrongful means. *See* Restatement (Second) of Torts § 768, cmt. (b) ("The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section."). Moreover, § 767 specifically defines "improper interference," a phrase also used in § 768, and that the Kentucky Supreme Court has interpreted to mean "wrongful," the operative word under § 768. *Cf. Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) (noting the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning.").

Finally, we address HCP's policy argument that the "district court's [] effort to 'blend' § 767 with § 768 diluted the competitive protections § 768 is designed to provide." (HCP Br. at 50.) We do not agree. To the extent the district court's hybrid approach *may* have increased the likelihood of liability under the facts of this case, the approach did not dilute the competitive protections of § 768. Robust competition may also require regulation, and unfair competitive practices certainly do not fall within the protections of § 768. Although courts should be circumspect in adjudicating claims

between competitors, wrongful and anti-competitive conduct should not be insulated from liability.  Indeed, the public interest in full and fair competition is furthered by imposing liability on a market player, such as HCP, for fraudulently leveraging a public market to sabotage a competitor, as liability for such conduct will deter similar future conduct and promote economic certainty in the marketplace.

Under these circumstances, we find that the district court properly resolved the interplay between §§ 767 and 768 as a matter of Kentucky law by instructing the jury pursuant to § 768 and also using certain factors listed in § 767 to explicate § 768.

### 2.          Breach of Contract

HCP next argues that the district court erred by allowing the jury to consider HCP's breach of its Standstill Agreement with Sunrise as wrongful conduct sufficient to establish "improper interference."   HCP's objection focuses on the following instruction given by the district court:

> HCP did breach its confidentiality agreement by submitting the February 14 topping bid.  This fact alone is not sufficient to establish tortious interference.  However, it may be considered along with the other evidence in determining whether HCP engaged in improper interference.

(Tr.12B at 103-04.)  Instead of this instruction, HCP had requested an instruction that its breach of the Standstill Agreement with Sunrise "does not constitute wrongful means for purposes of Ventas'[] claim."  HCP argues that the district court's instruction was erroneous because a breach of contract with a third party is not sufficient to satisfy the requirement of "improper interference."  *See, e.g.*, *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 664 (3d Cir. 1993).

HCP's argument fails as a matter of fact, and as a matter of law.  First, HCP's argument rests on a misreading of the record:  the district court did not permit the jury to consider HCP's breach of the Standstill Agreement with Sunrise as sufficient to establish "significantly wrongful" conduct.  The jury instructions explicitly defined "significantly wrongful means" to include "fraudulent misrepresentation, deceit and

coercion," and stated that breach of the Standstill Agreement "alone is not sufficient to establish tortious interference." (Tr.12B at 103-04.)

Second, the district court did not commit legal error by permitting the jury to consider HCP's breach of its contract with Sunrise "along with the other evidence in determining whether HCP engaged in improper interference." (*Id*. at 104.) Although the relevance of a breach of contract with a third party in a tortious interference action has not been examined by many courts, other courts have similarly held that such a breach is evidence of "improper interference." *See, e.g., Kapunakea Partners v. Equilon Enters. LLC*, 679 F. Supp. 2d 1203, 1217 (D. Haw. 2009); *Foam Supplies, Inc. v. Dow Chem. Co.*, No. 4:05CV1772, 2008 WL 3159598, at *7 (E.D. Mo. Aug. 4, 2008); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 306 (Utah 1982); *Island Air, Inc. v. LaBar*, 566 P.2d 972, 980 (Wash Ct. App. 1977). HCP cites no case that holds a breach of contract with a third party is completely irrelevant.

As the district court observed, to ignore HCP's breach of its contract with Sunrise would "create an artificial reality within the case." (R. 520 at 9.) HCP's breach of its Standstill Agreement with Sunrise illuminates the anti-competitive activities in which HCP engaged and is central to an understanding of Ventas' allegations of fraud and deception. As Ventas argued at trial, HCP misled the market by making public statements that were contrary to its obligations under the Standstill Agreement without disclosing the existence of the agreement or other relevant information. *See, e.g.*, *Hornung*, 754 S.W.2d at 859 ("[M]alice may be inferred in an interference action by proof of lack of justification.").

Accordingly, because the jury instruction regarding the relevance of HCP's breach the Standstill Agreement was an accurate and clear statement of the law, HCP's argument is without merit.

### 3.    Motive

HCP next argues that the district court erred by allowing the jury to consider HCP's motive without also "advis[ing] the jury . . . that the defendant's motive is not a sufficient basis for liability unless the defendant acted solely to inflict harm." (HCP Br. at 56 (emphasis omitted).) As described above, the district court instructed the jury, in pertinent part, as follows:

> Among other things, you may consider the parties' conduct, motive and the circumstances of the transaction to illuminate whether HCP's conduct amounts to significantly wrongful means.

(Tr.12B at 101-02.)

HCP contends that the district court should have instructed the jury that HCP did not act solely to injure Ventas. HCP asserts that the jury was "left free to punish HCP [because HCP] may have been motivated not merely to acquire Sunrise, but also in part to disadvantage Ventas." (HCP Rep. at 33-34.) This, according to HCP, would not amount to "improper interference" because a defendant does not engage in "improper interference" if "his purpose is at least in part to advance his interest in competing with the other." Restatement (Second) of Torts § 768(1)(d).

We find HCP's argument unavailing. The district court did not instruct the jury that it may find "improper interference" on the basis of motive alone. Nor do the jury instructions reasonably suggest that the jury was permitted to do so. Instead, the district court instructed the jury that "the only way to find in favor of Ventas is to find that HCP employed—I put it in quotes because it's a defined term—'significantly wrongful means' to interfere with Ventas'[] acquisition of Sunrise [] at $15 per unit." (Tr.12B at 101.)

The district court defined "significantly wrongful means" to include fraudulent misrepresentation, deceit and coercion. It was only after defining "significantly wrongful means" that the district court instructed the jury that HCP's motive may be relevant in determining whether it engaged in the type of conduct necessary to create

liability. *See, e.g.*, *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (noting that intent is relevant to fraud under Kentucky law). Nothing in the district court's jury instructions suggested that any degree of motive, without more, would be sufficient to establish "improper interference."

Accordingly, because the jury instructions regarding the relevance of HCP's motive were an accurate and clear statement of the law, HCP is not entitled to relief on the basis of this instruction.

### 4.     Causation

Finally, HCP argues that the district court failed to adequately instruct the jury on the

element of "but-for" causation. HCP requested the following jury instruction:

> If you are satisfied from the evidence that other factors, *including truthful information in HCP's offer and press release*, would have been sufficient to cause Sunrise['s] unitholders not to accept Ventas'[] $15 offer, then you will find for HCP[.]

(R. 430 at 4 (emphasis added).) The district court declined to give the proposed instruction, and instead instructed the jury as follows:

> Now, in element 4, to find that HCP prevented Ventas from acquiring Sunrise [] at $15 a unit, you must determine that but for HCP's improper interference, Ventas would have acquired Sunrise [] at $15 per unit. This but-for test means that if HCP's improper interference had never occurred, Ventas would have acquired Sunrise [] at $15 a unit.

(Tr.12B at 102-03.) HCP argues that the district court's instruction was erroneous because it did not require the jury to "separate the effect of the allegedly false representations from that of truthful statements." (HCP Br. at 59.)

We are unpersuaded by HCP's argument. Consistent with HCP's request during trial, the district court instructed the jury that in order to recover, Ventas must show that HCP's "improper interference," if any, was the but-for cause of Ventas' injury. This is an accurate statement of Kentucky law. The district court previously instructed the jury

with regard to "improper interference," and it was properly left to the jury to determine whether any of HCP's conduct amounted to "improper interference," and whether any such "improper interference" was the but-for cause of Ventas' injury.

Although the district court did not specifically enumerate "truthful information" as a relevant consideration, as HCP requested, it was not an abuse of discretion for the district court to decline to give this specific instruction. The instruction as given was clear and accurate, and enumerating one factor that may favor HCP, without enumerating others that may favor Ventas, could have unduly prejudiced Ventas by suggesting to the jury that the press release indeed contained independently truthful information.

Accordingly, the district court did not err in its instructions regarding the element of causation.

### III.    Sufficiency of the Evidence

We next turn to the sufficiency of the evidence. HCP contends that the district court erred in denying its motion for judgment as a matter of law on the element of causation under Rule 50(b) of the Federal Rules of Civil Procedure. For the reasons discussed below, we find that the jury verdict on the element of causation was supported by sufficient evidence.

#### A.    Standard of Review

Our case law establishes that "in diversity cases, where the Rule 50(b) motion is based on a challenge to the sufficiency of the evidence, a state-law standard of review applies."[11] *Hartford Fin. Servs. Grp., Inc. v. Cleveland Pub. Library*, 168 F. App'x 26,

---

[11] Our case law is unambiguous on this point, but most if not all of our sister circuits disagree. *See, e.g.*, *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008) ("In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate."); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 906 (8th Cir. 2005); *Fruend v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) ("We conclude that the district court erred in permitting California law to trump Federal Rule 50."); *Mathis v. Exxon Corp.*, 302 F.3d 448, 453 (5th Cir. 2002); *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 215 F.3d 182, 193 (1st Cir. 2000); *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000); *accord Herron v. S. Pac. Co.*, 283 U.S. 91, 94-95 (1931) (stating that a federal court sitting

30-31 (6th Cir. 2006); *see also In re Brown*, 342 F.3d 620, 626 (6th Cir. 2003) (citing *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 506 (6th Cir. 1998)). Under Kentucky law,

> a motion for a directed verdict . . . should be granted only if there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ. In deciding such a question, every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made.

*Morales*, 151 F.3d at 506 (internal quotation marks and citations omitted).

### B.     Application

HCP argues that Ventas presented insufficient evidence of but-for causation, which required Ventas to prove that, "but for HCP's improper interference, Ventas would have acquired Sunrise [] at $15 per unit." (Tr.12B at 102-03 (jury instruction).) According to HCP, Ventas failed to prove causation in two principal ways: first, Ventas did not separate the impact of any misrepresentations by HCP from that of any truthful disclosures by HCP; and second, HCP corrected any misrepresentations in the market prior to the unitholder vote on Ventas' offer. We address each argument in turn.

### 1.     Impact of Claimed Truthful Disclosures

In its first argument, HCP contends that Ventas was "required to prove that significantly wrongful conduct—alleged misrepresentations, not truthful disclosures—caused its injury," and that Ventas failed to carry this burden. (HCP Br. at 27-28.) Put another way, HCP asserts that Ventas failed to offer any proof that would allow the jury to separate the impact of any misrepresentations from that of any truthful

---

in diversity is "not subject" to a state rule that a court "shall not direct a verdict, where the evidence is such that a verdict the other way would be set aside"). Our sister circuits appear to have the better view. Although a federal court sitting in diversity applies the substantive law of the forum state, the federal court ordinarily applies its own rules of procedure to adjudicate the dispute. *See, e.g.*, *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1442-45 (2010) (citing, *inter alia*, *Hanna v. Plumer*, 380 U.S. 460, 463-64 (1965)). We are bound by prior decisions of this Court that apply a so-called "state law standard" for judgment as a matter of law under Rule 50, but perhaps this Circuit's *en banc* Court will in the future reconsider the issue.

statements. This is significant, HCP argues, because its February 14, 2007 press release contained the truthful statement that HCP was willing to pay $18.00 per unit for Sunrise. HCP asserts that the unitholders rejected Ventas' initial offer "for the obvious reason that HCP was willing to pay more." (*Id.* at 27.) Investor reliance on such a truthful statement, HCP continues, is insufficient to support the verdict because it cannot amount to "improper interference." (*Id.* at 27-28 (citing Restatement (Second) of Torts §772(a) & cmt. (b)).)

HCP relies on this Court's decision in *Technology for Energy Corp. v. Scandpower*, 880 F.2d 875 (6th Cir. 1989). In *Scandpower*, we held that the presence of a truthful statement that accompanied a false statement defeated the element of causation in that case because the truthful statement "alone was sufficient to 'doom' [the] bid." *Id.* at 878. HCP argues that this case is analogous to *Scandpower* as "no Sunrise unitholder testified that its vote was affected by any alleged misrepresentation." (HCP Br. at 31.)

We find HCP's argument unavailing. HCP's argument rests on the faulty factual premise that HCP was "willing to pay $18 per unit of Sunrise," and that this stated willingness was independently truthful. (*See id.* at 30.) Indeed, the jury could reasonably have found that HCP made no such statement, and that even if it did, the statement was not independently truthful.

The jury could reasonably have found that HCP never stated that it was "willing" to pay $18.00 per unit. HCP's February 14, 2007 press release merely stated that HCP had "submitted a proposal to acquire the assets of [Sunrise] in a transaction that values each [] unit at Cdn$18." (App. at 454-55.) The press release then described the proposed transaction as containing an "acquisition agreement that . . . is otherwise identical to the agreement between Sunrise [] and Ventas." It further stated that HCP was "confident" that it would reach a deal with SSL and that its proposed acquisition of Sunrise had a "greater certainty of completion" than the Ventas transaction. The press release only references the offer of $18.00 per unit as part of an overall "transaction."

Even if the jury found that HCP had stated its willingness to pay $18.00 per unit, the jury reasonably could have also found that such a statement was not truthful. HCP never made an unencumbered assertion that it was willing to pay $18.00 per unit, and the jury could reasonably have found that HCP's announcement of its proposed "transaction" was contaminated by fraud, misrepresentations, and concealment. *See Dennis v. Thomson*, 43 S.W.2d 18, 23 (Ky. 1931) ("[C]ausing a false impression constitutes a palpable fraud, even though the statement is true as far as it goes, since such concealment is in fact a false representation of that which is disclosed, as the whole truth.").

HCP failed to disclose in its February 14, 2007 press release that its offer was conditioned on reaching an agreement with SSL. HCP also failed to disclose that HCP and SSL had previously failed to reach an agreement during the auction process; that HCP and SSL otherwise had a tense relationship that could frustrate future attempts to negotiate an agreement; and that HCP was a party to a Standstill Agreement with Sunrise that may have prohibited HCP from making an offer for Sunrise in the first place. Rather than disclosing these details, HCP misled the market by announcing that the terms of its proposed acquisition of Sunrise were "identical to the transaction entered into by Ventas," and the proposed acquisition itself had "greater certainty of completion."

Moreover, HCP's conduct at the time of its purported offer casts further doubt on the genuineness of its offer. HCP never sent Sunrise a signed, unconditional offer. The purchase agreement that HCP sent to Sunrise made no mention of a condition. Sunrise described HCP's omission of a signature as "unprecedented" (Tr.3A at 47) and tantamount to a "bait and switch." (App. at 456.) When confronted about the missing signature, HCP CEO Flaherty falsely stated to Sunrise's banker that he had sent a signed agreement via Federal Express. Flaherty subsequently admitted, however, that he did not do this and in fact was not authorized by HCP to make an unconditional bid. (Tr.4B at 32-34.) Ventas also presented evidence that HCP stated it was "moving on to other things" in January of 2007 after it was unable to reach an agreement with SSL, and in

fact, on February 21, 2007, made a $3.1 billion proposal to buy another company, referred to as "Slough." (Tr.2A at 39; Tr.4B at 96.)

## 2. Impact of Claimed Corrective Disclosures

HCP next argues that the subsequent disclosures of truthful information about its offer broke the chain of causation as a matter of law. Specifically, HCP asserts that any misrepresentations contained in its February 14, 2007 press release were corrected prior to the unitholder vote on the Ventas deal. HCP cites the testimony of certain unitholders to suggest that unitholders were aware of the conditional nature of the offer shortly after HCP's February 14, 2007 press release. (*See, e.g.*, HCP Br. at 34-35 (citing, *inter alia*, R. 486 at 188-89 (Morgan Stanley).) To the extent that any confusion lingered in the market, HCP notes that the condition was explicitly referenced in a February 19, 2007 press release by Sunrise, and a February 22, 2007 press release by Ventas. (App. at 590, 1228-29.) The proxy statements sent to unitholders on or about March 6, 2007 also discussed the existence of the condition. (*Id.* at 1240-54.)

HCP relies heavily on the market price of Sunrise during the relevant period. After HCP publicly announced its bid, the market price of Sunrise increased from approximately $15.00 per unit to $18.00 per unit, and remained at that approximate price until the unitholders rejected the Ventas deal. HCP notes that Ventas' expert admitted that he failed to find any statistically significant drop in the price of Sunrise after HCP disclosed that its bid was conditional. Because the alleged corrective disclosures had no effect on the stock price, HCP contends that "any alleged misrepresentations either did not mislead or 'were immaterial as a matter of law.'" (HCP Br. at 42 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).)

We again find HCP's argument unavailing. The purported corrective disclosures—none of which were made by HCP directly—do not disprove causation as a matter of law. The jury could reasonably have found that any purported corrections were "incomplete and did not neutralize the effect of HCP's fraud on proxy voting that started on March 7." (Ventas Br. at 40.) This would explain why the market price of Sunrise did not fall significantly after the market learned of the existence of the

condition, and therefore why HCP's argument fails to show a break in the chain of causation. We note the many reasons that doom HCP's argument on appeal.

First, the public never learned of the difficulties that HCP would likely face in reaching an agreement with SSL and thus in satisfying the condition. Although investors may have come to know of the existence of the conditional nature of HCP's offer, investors never learned the details of the troubled relationship between HCP and SSL, or that HCP's insistence on certain development rights threatened to prevent a deal from materializing as quickly as HCP suggested that it would, if a deal materialized at all. Even if the jury were to credit HCP's argument that it was SSL, not HCP, that caused the breakdown of the original negotiations, the difficult relationship between the parties, regardless of the cause of the difficulty, could likely frustrate future negotiations.

Moreover, to the extent the public learned of the existence of the condition, the jury could reasonably have found that HCP falsely suggested to the market that it would remove the condition. On February 28, 2007, for instance, Flaherty suggested, in a letter to Sunrise that was made public, that HCP might be "willing to remove the closing condition" (App. at 733.) But Flaherty admitted at trial that he did not make an unconditional offer because he was not sufficiently confident that HCP would reach a deal with SSL, and in fact was not authorized to make a binding offer. (*See, e.g.*, Tr.4A at 75.)

Second, Ventas presented evidence that, in the aftermath of HCP's wrongful conduct, investors recognized that Ventas would be forced to raise its bid to complete the transaction so as to avoid injury to its reputation. (*See, e.g.*, *id.* at 101-03, 112; Tr.7B at 18.) This would suggest that the effects of HCP's wrongful conduct lingered in the market because investors sought to capitalize on its effects on Ventas' original offer.

Third, the on-going litigation in Canada was not resolved until approximately two weeks after voting on the Ventas deal had begun. This timeline may have suggested to unitholders that the HCP deal was viable. Because HCP disclosed neither the difficulties it would likely encounter in reaching an agreement with SSL, nor any other

factual barrier to the agreement, the pendency of the Canadian proceedings may explain why Sunrise's unit price did not fall.

Finally, HCP's initial misleading statements changed the unitholder composition of Sunrise, which made approval of Ventas' $15.00 per unit offer highly unlikely. In the 48 hours after HCP announced its offer, over 40 million units of Sunrise changed hands, representing the largest day in the trading history of Sunrise. The evidence suggests that these new unitholders were largely arbitragers from the United States and had little incentive to accept Ventas' $15.00 bid, even after HCP withdrew its offer. As the district court observed, "[t]he jury could reasonably decide that in the absence of this market shift, which it decided was caused by [HCP's] significantly wrongful conduct, [Ventas'] $15 offer would have been approved." (R. 520 at 5.)

HCP asserts "those new unitholders could not have affected the outcome of the vote" because the four largest unitholders "by themselves cast more than sufficient votes to defeat Ventas'[] offer." (HCP Br. at 45-46 (emphasis omitted).) But Ventas presented evidence that its initial offer of $15.00 was a good price to the unitholders and was recognized as such by the market and certain institutional unitholders. (*See, e.g.*, R. 482 at 102-03 (testimony of representative from Caisse, the largest Canadian unitholder, that he would have initially recommended approval); Tr.7A at 87-95 (testimony of Ventas' expert, opining that the Ventas offer had a 95% expectation of approval).) To the extent HCP cites competing testimony, the jury was not compelled to credit this speculative testimony, particularly in light of Ventas' evidence suggesting the opposite. Moreover, Ventas presented evidence that the institutional investors never learned of the obstacles that might prevent the condition from being realized, namely the difficult relationship between HCP and SSL. Such knowledge alone could have caused the unitholders to doubt the viability of the HCP offer and thus vote in favor of the Ventas deal. Institutional investors, for instance, testified that they believed a deal with HCP might still be viable even after HCP withdrew its bid. (*See, e.g.*, Tr.3A at 78.)

In light of the totality of the evidence presented at trial, the jury arrived at a reasonable conclusion regarding the element of causation. The jury had sufficient

evidence to find that HCP's "improper interference" caused injury to Ventas. Accordingly, we find that Ventas presented sufficient evidence to support a jury finding of causation, and **AFFIRM** the decision of the district court on that basis.

### IV.    Summary

For the reasons set forth above, we **AFFIRM** the judgment of the district court in the amount of $101,672,807.00 in favor of Ventas.  Although the case shall be remanded, as discussed below, we find no reason to disturb the final judgment previously entered on the original jury verdict.  Accordingly, the judgment as previously entered by the district court shall constitute a final partial judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 54(b) ("[T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay.").

### DISCUSSION - CROSS-APPEAL BY VENTAS

As an initial matter, we note HCP's argument that Ventas has waived the issues it raises on cross-appeal because Ventas' arguments are "based largely on cryptic assertions and unexplained citations." (HCP Rep. at 43 (citing *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009).)  Although Ventas' briefing left much to be desired, we nonetheless find that the issues raised by Ventas on cross-appeal are properly presented.

We now turn to those issues.  Ventas challenges the judgment below on the basis that the district court erroneously precluded it from recovering additional damages. Specifically, Ventas argues that the district court erred by: 1) refusing to submit the issue of punitive damages to the jury; 2) converting its damages from Canadian to U.S. dollars based on the exchange rate as of the date of injury, rather than the date of judgment; 3) precluding Ventas from seeking compensatory damages based on increased financing costs and currency market fluctuations; and 4) declining to award prejudgment interest.

As explained below, we conclude that the district court erred by not submitting the issue of punitive damages to the jury, therefore requiring us to **REVERSE** the

decision below as to punitive damages, and **REMAND** for further proceedings. We **AFFIRM** in all other respects.

## I.   Punitive Damages

Ventas argues that there was sufficient evidence of fraud to submit the issue of punitive damages to the jury. The district court disagreed and granted judgment as a matter of law to HCP on the issue of punitive damages.**[12]** *See* Fed. R. Civ. P. 50(a). Upon review, we conclude that the district court erred in granting judgment as a matter of law in this instance.

### A.   Standard of Review

"The question of whether there was sufficient evidence to support a punitive damages award is a question of law, which we review de novo." *Virostek v. Liberty Twp. Police Dep't*, 14 F. App'x 493, 508 (6th Cir. 2001). Because we are sitting in diversity, "we use the standards for a judgment as a matter of law applicable under the law of the forum state." *Dewit v. Morgen Scaffolding*, *Inc.*, 78 F.3d 584 (6th Cir. 1996) (table); *see also Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 407-08 (6th Cir. 2005); *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1248 (6th Cir. 1984). As we have explained:

> Under Kentucky law, a motion for a directed verdict—the same thing as a motion for judgment as a matter of law under Rule 50(a)—should be granted only if there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ. In deciding such a question, "every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made.

---

**[12]**Although the issue was presented to the district in a motion *in limine* filed by HCP, the disposition of the motion is properly reviewed as one for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. Both parties agree. (R. 439; HCP Mot. at 4 (noting that the district court previously "granted a directed verdict on punitive damages"); Ventas Rep. at 5-8.) HCP's motion was based on an argument of insufficient evidence, and the district court granted the motion during trial on that basis. *See* Fed. R. Civ. P. 50(a) (providing that a district court may grant judgment as a matter of law on any issue for which it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.").

*Estate of Riddle*, 421 F.3d at 408 (quoting *Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 231 (6th Cir. 1997)) (internal quotation marks, citations, and alterations omitted).

### B.     Punitive Damages Under Kentucky Law

Before turning to the evidentiary record, we outline the applicable legal standard governing punitive damages under Kentucky law.  Kentucky has long-recognized the availability of punitive damages in tort actions.  *See, e.g.*, *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985) (collecting cases); *Engleman v. Caldwell & Jones*, 47 S.W.2d 971, 972 (Ky. 1932).

In 1988, Kentucky abrogated the common law of punitive damages with the enactment of Kentucky Revised Statute ("K.R.S.") §§ 411.184, *et seq*.  The statute defines punitive damages as those "damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future."  K.R.S. § 411.184(1)(f); *see also Young v. Vista Homes, Inc.*, 243 S.W.3d 352, 366-76 (Ky. Ct. App. 2007).  The party seeking punitive damages "shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud, or malice."  K.R.S. § 411.184(2).

Here, Ventas seeks punitive damages on the sole basis of fraud.  Under the statute, "[f]raud means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff."  K.R.S. § 411.184(1)(b).  This standard appears similar to that required to impose tort liability for fraud under Kentucky law, which requires a showing of the following by clear and convincing evidence:

> (a) material representation; (b) which is false; (c) known to be false or made recklessly; (d) made with inducement to be acted upon; (e) acting in reliance thereon; and (f) causing injury.

*Rickert,* 996 S.W.2d at 468; *see also Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 817 F. Supp. 643, 646 (W.D. Ky. 1993).

Additionally, although not expressly stated in the statute, Kentucky law requires a plaintiff seeking punitive damages to prove that the relevant actions of the defendant were the proximate cause of the resulting injury to the plaintiff. *See, e.g.*, *Jackson v. Tullar*, 285 S.W.3d 290, 297 (Ky. Ct. App. 2007).

### C.    Application

Based on the applicable law, the issue we confront is whether sufficient evidence exists that 1) HCP "acted towards Ventas" with fraud; 2) HCP had the "intention of causing injury" to Ventas; and 3) HCP's fraud proximately caused Ventas' injury. *See* K.R.S. § 411.184(1)(b); *Jackson*, 285 S.W.3d at 297. Viewing the evidence in the light most favorable to Ventas, as we must in reviewing this issue, we find that the issue of punitive damages should have gone to the jury.[13] *See Estate of Riddle*, 421 F.3d at 410 (remanding case for trial on punitive damages).

The record is replete with evidence of intentional misrepresentations, deceit, and/or concealment of material facts by HCP. *See Rickert*, 996 S.W.2d at 468 (noting the following as relevant to a finding of fraud: "character of the testimony, the coherency of the entire case as well as the documents, circumstances and facts presented"); *Cintas Corp. v. Sitex Corp.*, No. 2005-CA-002377, 2005-CA-002415, 2007 WL 3226984, at *1 (Ky. Ct. App. Nov. 2, 2007) (upholding punitive damage award on tortious interference claim between competitors).

We begin by noting the testimony of Michael Warren, the Chairman of Sunrise. Warren testified that after being approached by HCP about its interest in making a topping bid, Warren requested that HCP not make its bid public and instead engage in confidential negotiations. When HCP refused, Warren was "flabbergasted" and "surprised." (Tr.3A at 35-36.) This was the "first time" Warren had ever known a participant in a confidential auction process to make an unauthorized public bid. (*Id.* at 35.) Warren also testified that Flaherty falsely stated to Sunrise that Flaherty had sent

---

[13]In light of our holding, we need not consider Ventas' argument that the district court applied an erroneous legal standard as to the availability of punitive damages under Kentucky law.

a signed, unconditional offer to Sunrise. Flaherty admitted at trial that he was not authorized to make an unconditional bid.

Moreover, as discussed *supra* pages 28-34, the jury could reasonably conclude, based on the evidence, that HCP's February 14, 2007 press release was contaminated by fraudulent misrepresentations, and concealment. *See Anderson v. Wade,* 33 F. App'x 750 (6th Cir. 2002) (upholding punitive damages award under Kentucky law, where defendant intentionally concealed material facts and made material misrepresentations in the sale of land). Without repeating our entire discussion, we again note that HCP's announcement of its purported offer of $18.00 per unit failed to disclose material facts known to HCP, including: 1) that its offer of $18.00 per unit was conditional on HCP reaching an agreement with SSL; 2) that HCP's prior experiences with SSL suggested that it would be difficult for HCP and SSL to reach an agreement; and 3) that HCP was a party to a Standstill Agreement that likely prohibited its public offer. (*See, e.g.*, Tr.2B at 89 (testimony of Sunrise's independent investment banker, stating that HCP's 2/14/07 press release was "misleading"). HCP instead misrepresented that its offer was largely "identical" to that made by Ventas, and that the HCP transaction had a "greater certainty of completion." HCP never corrected the record directly, and in fact maintained that its offer was superior. (*See, e.g.*, Tr.5A at 25-27.) Flaherty admitted that he was not sufficiently "confident" of reaching an agreement with SSL to make an unconditional bid. (Tr.4B at 64.)

We also believe that a reasonable jury could conclude that HCP engaged in its fraudulent conduct with the intention of inflicting harm on Ventas. Indeed, as we discussed, *supra* at pages 28-34, HCP's conduct suggests that its purported offer of $18.00 per unit was not genuine: the purported offer was not signed, which a knowledgeable witness described as "unprecedented" (Tr.3A at 47); HCP's CEO informed Sunrise that he had sent a signed contract to Sunrise, when in fact he had not; and HCP's CEO admitted that he was not authorized to make an unconditional bid for Sunrise. As Sunrise's CEO testified at trial about his experience with HCP:

> after you've been through all of that, you know, the conclusion that you come to as a business person is that these people are not real, they are not reliable, and so we were not going to attach our star to HCP.

(*Id.* at 82.)  In fact, a financial advisor from Sunrise testified that, in January of 2007, HCP CEO Flaherty declined an offer of additional time to attempt to reach an agreement with SSL, stating that HCP was "moving on to other things."  (Tr.2A at 39.)

HCP's investment banker reported to his colleagues that, although HCP remained focused on acquiring Sunrise, "at a minimum, they plan on causing the other side to have to pay more."  (App. at 362.)  HCP's CEO code-named its topping bid strategy as "project show me what you got, yoe mama," referring to the female CEO of Ventas. (Tr.4B at 126.)  HCP believed that it would be "hosed" if Ventas acquired Sunrise (*id.* at 156), as it might allow Ventas to "catch" HCP in the marketplace.  (*Id.* at 102.) Sunrise's CEO testified at trial that he did not believe HCP's offer for Sunrise to be bona fide, and suggested that HCP's bid "drove up the market . . . and killed the $15 bid." (Tr.3A at 81.)  A managing director of ING, one of the largest unitholders, testified about the possibility that HCP had used ING to cause Ventas to pay more for Sunrise. (R. 487 at 146.)  A senior executive of HCP suggested that it "would be okay if she ended up in 17.50." (Tr.5A at 135-37.)

Finally, based on the evidence, a reasonable jury could conclude that HCP's fraud was the proximate cause of Ventas' injury.  The jury found that HCP's tortious interference caused Ventas to pay an additional $1.50 per unit of Sunrise beyond its initial offer of $15.00 per unit.  Although Sunrise units were trading at approximately $15.00 per unit after Ventas announced its proposed acquisition, the price per unit increased by 20% to approximately $18.00 per unit after HCP made its unauthorized public offer on February 14, 2007.  The price would never return to $15.00 per unit, and Ventas would eventually raise its offer to $16.50 per unit to complete the acquisition.

If the question had been presented to the jury, the jury could reasonably have found that it was the fraudulent character of HCP's conduct that proximately caused the injury to Ventas.  As discussed above, the evidence suggests that HCP's public

announcement of its offer was more than a simple breach of its Standstill Agreement with Sunrise, but instead was a fraudulent act designed to mislead the market and harm Ventas. The fraud contained in the February 14, 2007 press release caused the market price of Sunrise to increase from $15.00 to $18.00. The jury could reasonably have found that absent the fraudulent character of HCP's public announcement, the market price of Sunrise would not have increased, or would not have increased as dramatically. Additionally, the jury could have reasonably found that HCP never directly corrected its fraud, allowing some if not all of the effects of the fraud to linger in the market and continue to operate against Ventas.

This is not a case where the alleged fraud by the defendant was collateral to the plaintiff's injury. For instance, in *Hardaway Management v. Southland*, 977 S.W.2d 910, 916-17 (Ky. 1998), the Kentucky Supreme Court denied recovery of punitive damages in a wrongful termination action under a state employment law. The only evidence of fraud was a termination letter from the employer that falsely stated the reasons for the plaintiff's termination. *Id.* at 916. The court disallowed punitive damages because the false statements did not cause any injury to the plaintiff. *Id.* at 917. The court reasoned that even if the statements "were intended to prevent [the plaintiff from] recovering damages for her wrongful discharge, they failed in their intended effect." *Id.*

Unlike *Hardaway Management*, HCP's alleged fraud in this case was the direct cause of Ventas' injury. Simply put, the jury could reasonably find that the fraud itself was the primary vehicle by which HCP inflicted injury on Ventas. Absent the intentional misrepresentations, deceit, and/or concealment by HCP, which we detail above, the market may well have reacted less favorably to HCP's purported offer of $18.00 per unit, or may perhaps have dismissed HCP's offer altogether. *Cf. Bierman v. Klapheke*, 967 S.W.2d 16, 19-20 (1998) (upholding punitive damages award, where the fraudulent acts exacerbated any injury that may have occurred).

In light of the evidence presented at trial, we believe it was error for the district court to prevent the jury from considering an award of punitive damages. Accordingly,

we **REVERSE** the decision of the district court as to punitive damages, and **REMAND** with instructions that the matter proceed to trial on the single issue of punitive damages. *See Estate of Riddle*, 421 F.3d at 410 (remanding case for trial on punitive damages). On remand, the district court shall be guided in part by K.R.S. § 411.186, which sets forth numerous factors that the jury "should consider" if the jury decides to award punitive damages.

## II.     Applicable Exchange Rate

Ventas appeals the district court's decision to apply the U.S./Canadian exchange rate as of the date of injury, rather than the date of judgment. Because the decision of the district court rests on an interpretation of state law, we review *de novo*. *See Competex, S.A. v. Labow,* 783 F.2d 333, 334 (2d Cir. 1986) (stating that "[b]ecause determination of the date on which to convert a foreign currency debt into dollars is a substantive question," federal courts sitting in diversity will apply state law).

In the proceedings below, the parties disputed the exchange rate applicable to Ventas' damages. Ventas sought to apply the exchange rate as of the date of judgment, while HCP sought to apply the exchange rate as of the date of injury. The district court agreed with HCP, and held that "[t]he proper exchange rate for Ventas'[] damages is determined on the date of injury," which was April 26, 2007, the date that the Sunrise unitholders approved Ventas' revised offer of $16.50 per unit. The district court relied upon the rule set forth in two older Supreme Court cases, that if the cause of action arises under U.S. law, then the conversion date is the date of injury. *See, e.g.*, *Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517 (1926); *Hicks v. Guinness*, 269 U.S. 71 (1925).

On appeal, Ventas argues that the district court should have used the date of judgment exchange rate. Ventas contends that the Supreme Court cases cited by the district court are not controlling because "state law governs the appropriate currency rate in diversity cases." (Ventas Br. at 71.) Ventas asserts that Kentucky would follow the commentary to § 823 of the Restatement (Third) of Foreign Relations Law (1987), which

states that "if the foreign currency has appreciated since the injury or breach, judgment should be given at the rate of exchange applicable on the date of judgment or the date of payment." Restatement (Third) of Foreign Relations Law § 823, cmt. (c).

Although no Kentucky law is on point, we find that the district court correctly predicted that Kentucky would select the exchange rate from the date of injury. Nothing in Kentucky jurisprudence suggests that the state would rely on a comment to the Restatement (Third) of Foreign Relations, particularly in the face of Supreme Court precedent to the contrary. *See, e.g.*, *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 852-53 (6th Cir. 2002) (predicting that the Kentucky Supreme Court would reject a certain rule because, among other reasons, the U.S. Supreme Court had done so); *accord Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 669 F. Supp. 2d 538, 542 (E.D. Pa. 2009) ("In the absence of pertinent state law precedent, federal courts in diversity suits have frequently adopted the federal approach.") (collecting cases from courts applying the laws of Minnesota, Illinois, Colorado, Missouri, Tennessee, and Florida); *Elite Entm't, Inc. v. Khela Bros. Entm't, Inc.*, 396 F. Supp. 2d 680, 694 (E.D. Va. 2005) ("Courts generally agree that the judgment day interest rate is relevant only when the cause of action arises entirely under foreign law.") (predicting Virginia law).

Furthermore, because the purpose of compensatory damages is to make the victim whole, selecting the date of injury for purposes of the exchange rate would better approximate the damage sustained by the victim since such an approach looks to the point at which the victim was injured.[14] The date of judgment is merely an arbitrary and speculative future date that is determined by variables unrelated to the underlying injury, including litigation posturing and docket pressures. Setting the currency conversion rate as of the date of injury provides for greater certainty in economic relationships, allowing

---

[14]In this regard, we note that Kentucky provides for prejudgment interest in many cases, which is intended to compensate the plaintiff for any delay in obtaining relief. *See, e.g.*, *Curtis v. Campbell*, 336 S.W.2d 355, 361 (Ky. 1960) ("[E]quity and justice demand that one who uses the money or property of another for his own benefit, particularly in a business enterprise, should at least pay interest for its use in the absence of some agreement to the contrary.").

market players to more accurately assess their risks. It also prevents bad faith attempts to, for instance, delay the entry of judgment to engage in currency speculation.

Accordingly, we **AFFIRM** the district court decision to apply the date of injury rule for currency conversion as a matter of Kentucky law.

## III.    Compensatory Damages

Ventas appeals the district court's decision to deny Ventas recovery of certain claimed compensatory damages. Specifically, the district court precluded Ventas from recovering: 1) "the increased cost in U.S. dollars for the $15.00 component of the purchase price on April 26, 2007 as compared to the April 2, 2007 contracted-for closing date;" and 2) "the loss suffered by Ventas because HCP's improper interference delayed Ventas'[] planned equity raise to finance the acquisition." We now **AFFIRM**.

### A.    Legal Standard for Compensatory Damages Under Kentucky Law

We briefly review the applicable law governing compensatory damages. Under Kentucky law, a successful tort plaintiff may recover compensatory damages arising from the defendant's tortious conduct. The existence of these damages must be proved to a "reasonable certainty." *See, e.g.*, *Morgan v. Lanham*, No. 2008-CA-001412, 2011 WL 918735, at *18 (Ky. Ct. App. Mar. 18, 2011) (emphasis omitted).

Additionally, the defendant's tortious conduct must be the proximate cause of the damages. As the Kentucky Supreme Court has explained, "[p]roximate cause . . . consists of a finding of causation in fact, i.e., substantial cause," as well as legal causation, meaning "the absence of a public policy rule of law which prohibits the imposition of liability." *Deutsch v. Shein*, 597 S.W.2d 141, 144 (Ky. 1980). With regard to legal causation, Kentucky courts look to foreseeability: "it is not necessary that the defendant should have been able to anticipate the precise injury sustained, or to foresee the particular consequences, but only that the injury is a natural and probable consequence" of the tortious conduct. *Louisville Gas & Elec. Co. v. Roberson*, 212 S.W.3d 107, 112 (Ky. 2006) (Wintersheimer, J., concurring) (citing *Eaton v. Louisville & N. R. Co.*, 259 S.W.2d 29 (Ky. 1953)); *see also Pile v. City of Brandenburg*, 215

S.W.3d 36, 42 (Ky. 2006) (noting that an intervening cause may break the chain of causation if it is of an "independent origin, unassociated" with the underlying tortious conduct).

### B.          Increased Costs to Finance Acquisition Due to Delay

Ventas first argues that it is entitled to "damages from the increased cost of financing the transaction." (Ventas Br. at 74.) Ventas explains as follows:

> HCP's deceptive press release forced Ventas to delay, from February 22[, 2007] to May 18, 2007, its planned sale of equity to finance the acquisition. As a result, Ventas incurred substantially higher financing costs as its stock value declined.

(*Id.* at 72.) The district court granted summary judgment for HCP on this claim.

We review the district court's grant of summary judgment *de novo*. *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 792 (6th Cir. 2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

The district court acknowledged that "HCP's topping bid delayed any plan Ventas may have had to issue shares in February[ of 2007]," but granted summary judgment because it found no evidence that "establishes an actual date for issuing shares." The district court reasoned that the "evidence does not suggest that HCP knew of any actual plan by Ventas' to issue equity in this transaction, [n]or does any evidence suggest that HCP would know the timing on that issuance." Therefore, the district court found, "Ventas'[] issuance of shares was not clearly foreseeable." The district court also held that HCP's "acts [were] not substantial factors in bringing about the harm" for which Ventas seeks compensation, and that "Ventas received full market value for the shares when issued."

On appeal, Ventas argues that it "presented ample evidence that it planned to raise equity in late February 2007 to finance the acquisition." Ventas cites, with little

explanation, an affidavit from its CEO; a presentation to the Ventas Board; and correspondence about a planned $1 billion equity raise.  (Ventas Br. at 73-74 (citing App. at 748-50, 844-46; R. 193, Ex. 65 ¶¶ 4-6, 9 & Ex. C).)  Ventas also notes that it was "hell bent" on proceeding with an equity raise.  (*Id.* at 74 (citing record evidence).) Additionally, Ventas argues that the record contains "ample evidence of foreseeability," and cites: 1) a January 17, 2008 analysis from HCP's investment bankers "showing that Ventas would finance the acquisition through $1.059 billion of 'New Common Equity Issued;'" (*id.* (citing App. 366, R. 193, Ex. 104)); and 2) the testimony of HCP's CEO, stating that he expected Ventas' stock price to decline after HCP's public offer.  (*Id.* (citing Tr.4B at 154).)

Having reviewed the record, we find that the district court properly granted summary judgment for HCP on this claim for damages.  Kentucky law "does not tolerate uncertainty as to the fact of damage," *Lanham*, 2011 WL 918735, at *18 (emphasis omitted), and as such, Ventas must show, with a "reasonable certainty," that it sustained damages in the first instance.  *See id.*  Based on our review of record, we conclude that no reasonable jury could find, with any reasonable certainty, that Ventas had decided to conduct an asset sale to take place at any particular time.  Without the record supporting such a finding, Ventas' claim for damages arising out of the timing of its claimed asset sale fails as a matter of law.

The evidence relied upon by Ventas in support of this claim for damages is wholly speculative and does not purport to identify a planned date for the equity offering.  (*See, e.g.*, App. at 844 ("considering asset sales"); *id.* at 1387 ("examining a number of different options").)  In fact, Ventas' CEO acknowledged in an email that the planned equity raise could well occur after February 22, 2007:  she stated on February 3, 2007 that Ventas seeks "maximum flexibility to hit the market for debt and/or equity securities (which *might even* be prior to the closing)," then scheduled for April 2, 2007. (*Id.* at 750 (emphasis added).)

Accordingly, we **AFFIRM** the grant of summary judgment for HCP on Ventas' claim for damages due to a claimed delay in its equity raise.

### C. Increased Costs of the Original $15.00 Purchase Price in U.S. Dollars

Ventas next argues that it is entitled to damages based on the "increased cost of the original $15.00 purchase price in U.S. dollars," as a result of exchange rate fluctuations in the international currency markets. (*See* Ventas Br. at 69.) Ventas explains as follows:

> Ventas contacted to acquire Sunrise on April 2, 2007 for $15 per share, a total of C$1,137,712,410 . . . plus assumption of Sunrise's debt. HCP's interference forced Ventas to delay the closing to April 26[, 2007]. By April 26, 2007, the value of the U.S. dollar declined against the Canadian dollar from .89366 to .86565. The C$1,137,712,410 price cost $31,867,325 more in U.S. dollars on April 26[, 2007] than on April 2[, 2007].

(*Id.* (internal record citations omitted).)

In an August 27, 2009 oral ruling, the district court denied Ventas' claim for this measure of damages. The court reasoned that Ventas did not have an "expectancy that could be proven to acquire the company on a specific date and certainly not at a particular value of the Canadian dollar." (Tr.7A at 28.) Rather, the district court held, Ventas' "expectancy was to purchase the company at $15 Canadian." (*Id.* at 50.) The district court also noted that "the risk of currency changes is a risk everybody faced." (*Id.*)

Ventas makes two arguments on appeal. The first is factual, that whether Ventas had a contractual expectation that the acquisition would close on April 2, 2007 is "a fact issue for the jury." (Ventas Br. at 69.) The second is legal, that "a decline in currency value is a direct and foreseeable consequence of a delay in contractual performance and is compensable." (*Id.* (citing *Walther & Cie v. U.S. Fid. & Guar.*, 397 F. Supp. 937, 945 (M.D. Pa. 1975).) Ventas contends that the tortfeasor "should bear the risk of fluctuations in market prices during a period of delay caused by its wrongful conduct." (*Id.* (citing *Payne v. Wood*, 62 F.3d 1418 (6th Cir. 1995) (table).) Additionally, Ventas argues that "the increased currency cost was part of Ventas'[] reasonable costs to mitigate its loss by extending the shareholder vote on approval of the deal at $16.50."

(*Id.* (citing *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1237-38 (10th Cir. 2006); Restatement of Torts § 919).)

We reject Ventas' arguments and affirm the decision of the district court. As an initial matter, we agree with the district court that, as a matter of law, Ventas "did not have a contractual expectancy" to acquire Sunrise "on a specific date and certainly not at a particular value of the Canadian dollar." (Tr.7A at 28.) The sole claim at trial was for tortious interference with a prospective advantage, which by its terms requires the plaintiff to prove an expectancy with which the defendant tortiously interfered. "The right to recover . . . consequential damages can hardly be divorced from the tort that allegedly caused them," *QSI-Fostoria D.C., LLC v. Gen. Elec. Cap. Bus. Asset Funding Corp.*, 389 F. App'x 480, 486 (6th Cir. 2010), and as the district court aptly noted:

> It seems to me that in the tort of the expectancy . . . the expectancy sued upon is the expectancy to purchase the company, to acquire the company, and to acquire the company at 15. I don't think there was an expectancy that could be proven to acquire the company on a specific date and certainly not at a particular value of the Canadian dollar. So I think that in terms of the tort of tortious interference with business expectancy, that expectancy that I have been defining it is to acquire the company at 15.

It is undisputed that Ventas voluntarily obligated itself in the Purchase Agreement to acquire Sunrise, a Canadian company, at a fixed amount of Canadian dollars. (App. at 281.) The Purchase Agreement with which HCP tortiously interfered did not address the risk of currency fluctuations. Ventas cites to no evidence that it selected April 2, 2007 as the original closing date because of any expectation that the exchange rates would be of a certain value. Because Ventas' underlying tort claim alleges interference with an agreement completely divorced from the international currency markets, Ventas' instant claim for damages fails as a matter of law. *Cf. Humphrey*, 272 U.S. at 519 ("A suit in this country is based upon an obligation existing under the foreign law at the time when the suit is brought, and the obligation is not enlarged by the fact that the creditor happens to be able to catch his debtor here.").

Moreover, any subjective expectation that Ventas had of closing the deal on April 2, 2007 was destroyed by its own actions. On March 24, 2007, Ventas sent a letter

to Sunrise in which it expressly "waive[d] its right" under the Purchase Agreement to insist that the Sunrise convene a unitholder meeting by March 31, 2007, which would permit the closing to occur on April 2, 2007. (App. at 1294-95.) Ventas instead requested that Sunrise postpone the unitholder meeting until April 11, 2007, so that the parties could update proxy materials to: 1) disclose that Sunrise's "financial performance in the fourth quarter is materially worse than street estimates;" and 2) describe the decision of the Ontario Court of Appeal. The letter explained that "Ventas believes that it would be appropriate to give Unitholders 10 business days after release of the financial and other information described [in the letter] to evaluate such information." (*Id.* at 1295.)

Furthermore, although Kentucky courts have not addressed the question, we believe that Kentucky law would deny recovery of compensatory damages arising from currency market fluctuations wholly unrelated to the defendant's conduct. These damages are unforeseeable. *See, e.g.*, *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 344-45 (Or. 2004) (holding that claimed damages caused by market forces during a delay caused by a defendant were unforeseeable as a matter of law). Ventas offers no citation to anything in the record to suggest otherwise. (Ventas Br. at 69-70; Ventas Rep. at 18-21.)

We considered a similar issue in *Layne v. Bank One, Kentucky, N.A.*, 395 F.3d 271 (6th Cir. 2005) (applying Kentucky law). In *Layne*, two individuals obtained a loan from a bank that was secured by their pledge of shares of stock in an internet company as collateral. The internet bubble burst in February of 2001, and as a result, the value of the collateral substantially declined. The loans eventually went into default, after which the debtors discussed with the bank either paying down the balance, or pledging additional collateral, rather than have the bank liquidate the collateral. The discussions were unsuccessful, and the bank liquidated the shares for a fraction of their former price.

The debtors brought a diversity action in federal court against the bank alleging, among other things, breach of a duty under Kentucky law to preserve the value of their collateral. The district court granted summary judgment to the bank on this claim, and

we affirmed. We held, as a matter of Kentucky law, that the duty of preservation does not extend to protecting against market declines. *Id.* at 276. The investment risk, we held, is properly placed on the borrower "given the volatility of the stock market." *Id.* at 277 (internal quotation marks and citation omitted). We then set forth a general rule that stock market fluctuation is unforeseeable as a matter of law, where the defendant has no knowledge of a pre-defined event that will impact the value of the security. *See id.* at 277 n.7 (internal quotation marks and citations omitted).

The same reasoning applies with equal force to the present case. The risk of market fluctuations is an uncontrollable, background risk that lurks in every commercial transaction. *See, e.g., In re Callister*, 15 B.R. 521, 533 (Bankr. D. Utah 1981) (stating that a market player is "at the mercy of events beyond its control"). More importantly, the risk is constant, and no more affects a plaintiff on one day rather than the next. Although the risk may have enured to Ventas' detriment in this case, Ventas "could have received a windfall had the fluctuation differed." *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 714 (9th Cir. 1992).

We believe that it is only when a defendant's conduct is connected to the movements in the markets, or the defendant has knowledge of a pre-determined future event, that Kentucky courts will permit recovery of consequential damages arising from market fluctuations.[15] *See Layne*, 395 F.3d at 276-77 & n.7. *Cf. Burstyn v. Worldwide Xceed Grp., Inc.,* No. 01 CV 1125, 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002) (holding, in the securities law context, that "the misrepresentations, and not the market forces behind the dot com collapse, must be the proximate cause of plaintiffs' injuries"). Here, it is undisputed that HCP's tortious conduct was not directed at the currency markets; Ventas makes no allegation that HCP's tortious conduct in any way affected the U.S./Canadian dollar exchange rate. HCP's conduct simply "provide[d] the occasion

---

[15] Our prediction about Kentucky law on this point comports with the general rule that, "'[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path.'" *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (quoting *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc)).

by which the injury was made possible." *Clay v. Chesapeake & O. Ry. Co.*, 239 S.W.2d 231, 232 (Ky. 1951).

Accordingly, we **AFFIRM** the grant of judgment as a matter of law for HCP on Ventas' claim for damages on account of fluctuations in the currency markets.

## IV.    Prejudgment Interest

Ventas appeals the denial of its Rule 59(e) motion for an award of prejudgment interest under state law.  Because the Court is sitting in diversity, prejudgment interest is governed by state law.  *See Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000).  We review the denial of a Rule 59(e) motion for an abuse of discretion.  *See U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 493 (6th Cir. 2003).  As applied to prejudgment interest, a district court abuses its discretion if it declines to award prejudgment interest that is mandatory under state law.  *See id.*

"Under Kentucky law, if the claim is liquidated, interest follows as a matter of right, but if it is unliquidated, the allowance of interest is in the discretion of the trial court."  *Hale v. Life Ins. Co. of N. Am.*, 795 F.2d 22, 24 (6th Cir. 1986).  As the Kentucky Supreme Court has explained:

> Precisely when the amount involved qualifies as "liquidated" is not always clear, but in general "liquidated" means "made certain or fixed by agreement of parties or by operation of law."  Common examples are a bill or note past due, an amount due on an open account, or an unpaid fixed contract price.

*Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991).

The district court in the instant case correctly concluded that Ventas' claim is unliquidated and therefore Ventas was not entitled to prejudgment interest as a matter of right.  Although, as Ventas argues, the jury may have resorted to "simple arithmetic" to calculate damages in this case, Kentucky law is clear that "in determining if a claim is liquidated or unliquidated, one must look at the nature of the underlying *claim*, not the final award."  *3D Enters.3d Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Deis.*, 174 S.W.3d 440, 450 (Ky. 2005) (emphasis in original).

The value of Ventas' underlying tort claim was neither "agreed upon by the parties [nor] fixed by operation of law or the parties." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010). Indeed, Ventas sought to recover damages beyond the $1.50 per unit increase in its offer, and, as the district court explained, the jury was free under the applicable law to award Ventas less than $1.50 per share if it found that Ventas could have offered a lower price to acquire Sunrise. (Tr.11B at 17); *see also Prosoft Automation, Inc. v. Logan Aluminum*, No. 03-CV-142, 2006 WL 1228773, at *2 (W.D. Ky. Apr. 28, 2006) ("[A]lthough the jury ultimately awarded Prosoft the full amount requested as compensation for [certain hours worked,] they were not reduced to a certainty in amount *prior to trial*.") (emphasis in original).

Accordingly, the district court's denial of an award of prejudgment interest to Ventas is **AFFIRMED**.[16]

**V.     Summary**

For the reasons set forth above, the grant of judgment as a matter of law on the issue of punitive damages is **REVERSED**, and the case is **REMANDED** with instructions that the matter proceed to trial on the single issue of punitive damages. The remaining decisions of the district court discussed herein are **AFFIRMED.**

### CONCLUSION

For the reasons discussed above, the judgment of the district court is **AFFIRMED**, but the district court's decision to preclude Ventas from seeking punitive damages is **REVERSED**, and the case is **REMANDED** for a trial solely on the question of punitive damages. The judgment of the district court as previously entered by the

---

[16]Ventas argues only that it was entitled to prejudgment interest as a matter of law. Ventas makes no argument that the district court should have, in the exercise of its discretion, awarded prejudgment interest. For this reason, we need not consider whether the district court erred in not doing so, although even if we were to consider the issue, nothing in the record suggests an abuse of discretion. *See Travelers Prop. Cas. Co. of Am.*, 598 F.3d at 276.

district court on September 8, 2009 shall stand as a partial final judgment under Rule 54(b) of the Federal Rules of Civil Procedure.[17]

---

[17]In light of the disposition of this appeal, HCP's motion to strike three paragraphs of Ventas' Reply Brief is **DENIED as moot.** We feel compelled, however, to note that the parties have filed nearly 100 pages of additional argument on this issue, complete with a panoply of uninvited conditional briefing that culminated in a sur-reply. Surely scores if not hundreds of attorney hours were devoted to this completely collateral and immaterial issue. We have not been asked to consider the reasonableness of counsels' time or actions in litigating this motion, but will simply note that counsels' conduct speaks for itself. We also will note, as we did at oral argument, that counsel for both parties have flouted the rules of this Court by filing *numerous* unauthorized letters, responses, and replies under the guise of Rule 28(j), but that contain additional argumentation not properly authorized under Rule 28(j), which only permits a party to advise the Court of supplemental authority under specified conditions. We trust that counsel will review the rules of this Court should counsel have occasion to appear before us in the future.

## CONCURRENCE

MERRITT, Circuit Judge, concurring. I agree with the result and much of the reasoning of Judge Clay's well-written opinion in this case, but I do not concur in the language of footnote 17 suggesting that counsel for both parties have "flouted the rules" and improperly run up the number of hours spent on the case. As a matter of fairness, I would not draw those inferences without knowing the details of counsel's work and charges and without giving counsel an opportunity to explain their actions.

Also, as to footnote 11, I would point out that the result would be the same whether we apply a state-law standard as a matter of substance or a federal law standard as a matter of procedure.